437 P.2d 928

**Roy H. KING and George Ellis, Appellants,**

v.

**Ernest UHLMANN and Richard Peil, Jr., and Arizona Title Guarantee & Trust Co., Appellees.**

**Ernest UHLMANN, Appellant,**

v.

**George ELLIS, Appellee.**

**Nos. 7418, 7423.**

Supreme Court of Arizona.

In Banc.

Feb. 7, 1968.

Rehearing Denied March 12, 1968.

138

John E. Madden, John S. Schaper, Phoenix, for appellants King and Ellis and appellee Ellis.

Snell & Wilmer, by Mark Wilmer, Phoenix, for appellee and appellant, Uhlmann.

Johnson & Shaw, by Marvin Johnson, Phoenix, for appellee, Richard Peil, Jr.

Perry, Coulter & Head, by A. R. Perry, Phoenix, for appellee, Arizona Title Guarantee & Trust Co.

McFARLAND, Chief Justice:

This is a case in which an action was brought by George Ellis as plaintiff against Ernest A. Uhlmann, Tracey Gaffey, and Richard Peil, Jr., as defendants, for an adjudication of the rights in certain real property. The superior court held the title to the property, the sale of which was negotiated by Ernest Uhlmann, to be subject to a constructive trust, and that since the date of the transaction in 1956 defendant Ernest Uhlmann and his wife Billie Uhlmann have held an undivided one-half interest in the

premises for the benefit of plaintiff George Ellis, subject to a lien in favor of Ernest Uhlmann in the sum of $10,000. Defendant Uhlmann appealed.

Roy King, as plaintiff, brought a separate action against Uhlmann, Peil, and Arizona Title Guarantee & Trust Co. as deedholder-defendant. The two actions were consolidated. The court rendered judgment against King, and he failed to perfect his appeal.

■ Uhlmann first contends that the trial court did not have jurisdiction because the case had been filed and tried under a court system existing prior to the amendment of Article VI of the Arizona Constitution, A.R.S. The action was brought in 1956, but no judgment was rendered until after the amendment of Article VI. Defendant contends that the repeal of Article VI of the Arizona Constitution in 1960 and the enactment of the new Article VI abolished the superior court in which the action was pending and established a new superior court. He asserts that the omission of a savings clause in the new Article VI resulted in the complete inability of the new superior court to continue the handling of the case; therefore, his motion to dismiss for lack of jurisdiction should have been sustained. The cases cited to support his position are not applicable.

■ The correct rule governing the instant case is stated in 82 C.J.S. Statutes § 435, at page 1010:

"The repeal of a statute does not operate to impair or otherwise affect rights which have been vested or accrued while the statute was in force. This rule is applicable alike to rights acquired under contracts and to rights of action to recover damages for torts. Where a new statute continues in force provisions of an old statute, although in form it repeals them at the moment of its passage, a right of action created by the old statute is not thereby destroyed."

An extensive analysis supporting this position is set forth in 77 A.L.R.2d 336, in connection with the repeal and re-enactment of a statute, but the same rule would apply to the repeal and re-enactment of a constitutional provision.

"If an action is brought upon a cause of action, * * * which depends upon the continued existence of a statute, the action is not abated by the repeal and re-enactment of the statute pending the trial. * * *" 77 A.L.R.2d at 345 Other cases supporting the rule are Jessee v. De Shong (1907); Tex.Civ.App., 105 S.W. 1011; Wayne v. Bureau of Private Investigators and Adjusters, 201 Cal.App.2d 427, 20 Cal.Rptr. 194.

■ The provisions of a repealed act, which are re-enacted, continue in force without interruption, and all rights previously incurred are preserved and may be enforced. 77 A.L.R.2d 336, 345; Middleton v. Taber (1896), 46 S.Ct. 337, 24 S.E. 282. If a statute creates a public office, the repeal of the statute, accompanied by the re-enactment of the substance of it, does not abolish the office and substitute a new one for it; the effect is to continue the old one in force. 77 A.L.R.2d 336, 371; Allgood v. Sloss-Sheffield Steel & Iron Co. (1916), 196 Ala. 500, 71 So. 724; Watts v. State (1926), 21 Ala.App. 516, 109 So. 762.

The situation in the instant case is even stronger. The constitutional amendment adopted was to create an intermediate court of appeals, and at the same time reorganize and integrate the whole judicial structure. The amendment provided:

"* * * The continued existence of any office heretofore legally established or held shall not be abolished or repealed by the adoption of this article. The statutes and rules relating to the authority, jurisdiction, * * * in force at the time of the adoption of this article and not inconsistent herewith, shall, so far as applicable, apply to and govern such courts, * * *" Ariz.Const., Art. VI, § 35 (1960)

There is even another reason to hold that there was no break in the continuity of the jurisdiction of the superior court. A.R.S. §§ 12–123 and 124 provide that the superior court shall have such jurisdiction as is conferred upon it by the Constitution. This statute, on the books prior to the commencement of this action, remains unchanged to this day, and provides additional continuity, in case it should be needed.

■ We hold that the superior court, prior to the constitutional amendment, and as it has existed since that amendment, are one and the same and that there has been no hiatus in its jurisdiction. All that was accomplished by the amendment was a reorganization and the creation of the court of appeals.

} Ernest Uhlmann next contends that: (1) there is insufficient or no evidence to support the findings of the trial court and its subsequent judgment, and (2) the parol-evidence rule and the statute of frauds were violated.

Disposing of these questions requires a summary of the evidence. Roy King became acquainted with George Ellis when a mutual friend suggested that they get together in order that King might possibly assist Ellis in straightening out Ellis's financial affairs. King was not a resident of Arizona, but he often stopped in Phoenix when flying to the west coast on business, and he and Ellis did transact some business. In 1954, Ellis showed King a forty-acre piece of property near the intersection of Bell and Scottsdale Roads in Maricopa County, and informed King that it might be purchased for a reasonable sum. King contracted to purchase the property from the Osbornes for a sale price of $12,000 in February 1954. King testified that Ellis had negotiated the deal with the Osbornes and also that he expected Ellis to keep his eye on the property for development possibilities. King executed an agreement between him and Ellis which provided that in the event of a sale of the forty acres, King would split on an equal-division basis any profits over the $12,000 purchase-price figure. King also invested some money in a cantaloupe crop which was raised on some property which Ellis had, and this venture was a failure, resulting in an $8,000 loss to King.

At an undisclosed later date, the agreement was orally modified so that King would recover $20,000 off the top of any sale before the profits would be split. This adjustment was made to allow King to recover the money he had lost in the cantaloupe venture.

Ellis had interests in large quantities of adjacent property in the Bell and Scottsdale Roads area, and in order to assist Ellis agreements were drawn up proposing the development of these properties. Uhlmann, Gaffey, Peil, and other parties' names appear in these transactions. During the negotiations leading to these agreements, Ellis placed confidence in the other parties and made a complete disclosure of his financial holdings. Although the forty acres which is the subject of this suit was not included in the property under the development agreements, defendants admit that Ellis told them of his one-half interest in this property. These development agreements failed because of inability to acquire the necessary financing.

The evidence in this case shows that throughout the financial dealings and arrangements, Ellis placed great faith and confidence in the defendants. The evidence further shows that Peil handled the transaction for Uhlmann in first finding the deal, in later doing the correspondence, and in drawing up the instruments involved in the conveyance from King to Uhlmann. Uhlmann admitted in his deposition that Peil was acting for him.

After the development agreements failed because of the lack of financing, it was decided that if Ellis had an interest of record in the forty acres, he then would be able to acquire some funds by borrowing against this interest. Pursuing this possibility, on or about February 28, 1956, Ellis called King and informed him of the idea, and

then introduced Peil to King over the telephone. King testified he told both Peil and Ellis that if it would help Ellis he would take $20,000 and step out of the picture. Peil himself stated on the stand that the substance of the agreement was that Ellis had a one-half interest, but King would be willing to forego any profit and would step out for $20,000 if it would help Ellis. Pursuant to this telephone conversation Peil prepared certain documents concerning the forty acres and mailed them to King for him and his wife to execute. Uhlmann was also contacted by Peil about acquiring an interest in the property. The documents Peil mailed to King were a quit-claim deed from King and his wife as grantors of an undivided one-half interest in the forty acres to Ellis and his wife as grantees for a consideration of ten dollars and a purchase-option agreement for the remaining undivided one-half interest in the property. King did not execute these documents, but sent Peil a letter dated March 3, 1956, wherein he stated he did not want to be placed in a position of looking to an undivided one-half interest to obtain his $20,000. He further wrote that he thought any quit-claim to Ellis would be delivered when the option was taken up, and that he was willing to forego any profit above $20,000 concerning the forty acres but he did not want to be left in the situation of conveying a one-half interest to Ellis for only ten dollars and then leave Ellis with an option to purchase the remaining one-half for $20,000 after placing only $200 down.

After Peil had talked to Uhlmann and received the March 3, 1956, letter from King, Peil sent another letter explaining that the accompanying documents would help Ellis in the negotiations *with which King was familiar*. The letter requested that King deed an undivided one-half interest in the forty acres to Uhlmann for $10,000 and this be put in escrow. There was also a purchase agreement for the remaining one-half which was to be sold for $10,000. This second one-half was to be paid for in three annual installments payable on the annual anniversary dates of the close of escrow of the first one-half, which was to be granted under deed. Dan Norton, a real estate agent, testified at the trial that the forty acres was worth $60,000 at the time of this conveyance. Uhlmann himself admitted that it would sell pretty easily at $40,000. There was a later interim arrangement which altered the transaction from undivided one-halves to an east one-half and a west one-half. King executed two deeds in which the east one-half was to go to the Uhlmanns when the first $10,000 was paid, and the escrow pertaining to the west one-half was to start then. On or before April 17, 1956, the first $10,000 was paid, and Arizona Title Guarantee & Trust Co. (the escrow agent) recorded the deed from the Kings to the Uhlmanns for the east one-half of the forty acres and recorded the purchase agreement dealing with the west one-half.

There has never been any conveyance from the Uhlmanns to Ellis, and, despite his frequent questioning of Peil and Uhlmann as to when escrow would close, he was never granted the one-half interest to which he claims right. Uhlmann and Peil both testified that after the King-Uhlmann transaction they requested Ellis to show them some evidence in writing that Ellis was entitled to a one-half interest in the forty acres. Ellis denied that such a request was ever made, but did testify that in earlier negotiations with Peil he had given Peil a copy of the King-Ellis memorandum that was executed in 1954; Peil had not only seen this document, but had possession of it for approximately three weeks. The evidence shows that Peil wrote King a letter in July of 1956, requesting him to inform Peil as to just what King's understanding of the King-Uhlmann transaction was and asking if he had anything of record showing that Ellis had a one-half interest in the forty acres. There is nothing in the record to show that this letter was ever answered.

142

Peil and Uhlmann had discussed the possibility of Peil's acquiring an interest in this forty acres and pursuant to these discussions Peil prepared three deeds. The first deed ran from Uhlmann to Paradise Realty (Peil's organization). The second was to convey a portion of the property conveyed in the first deed, and ran from Paradise Realty to Tracey Gaffey and his wife. Both of these documents were in evidence. The third deed ran from Paradise Realty to George Ellis, and although this deed was not in evidence Peil admitted he had drawn such a document. Uhlmann and Peil testified that the transactions never came about. Uhlmann never made the conveyance because his tax advisor advised against such a sale. For some unknown reason, Peil left these documents with Uhlmann; then on July 11, 1956, Gaffey somehow acquired the second deed which ran from Paradise Realty to him and his wife, and recorded the same.

The evidence shows that sometime prior to March 23, 1957, King became aware that there had never been a conveyance to Ellis of a one-half interest in the property. King sent a letter to the escrow holder directing that the instruments should not be delivered to the Uhlmanns because he [King] was rescinding the transaction due to misrepresentations. King also sent a letter to Peil and Uhlmann informing them that he was rescinding the transaction, and that legal action would be forthcoming. He offered to return all sums of money advanced so that the parties' status quo could be restored. This was the basis of King's action, which was dismissed by the court in the judgment for Ellis.

The trial court found there was full notice and a meeting of minds of Ellis, King, Uhlmann, and Peil to the effect that King would forego any profit on the sale of the forty-acre tract, that one-half of the forty acres would be conveyed to Ellis, and, further, that the transaction between Uhlmann and King was entered into in good faith by all parties pursuant to the under-standing that one-half of the forty acres would be conveyed to Ellis.

The court's finding was that at a later time Uhlmann refused to convey the agreed one-half to Ellis unless Ellis could produce evidence of title aliunde. The court in its judgment granted Ellis a constructive trust in an undivided one-half of the forty-acre tract, subject to a lien of $10,000 for sums advanced by the Uhlmanns, and ordered that this trust be executed. The court further decreed that the deed purporting to convey an interest in the same forty acres from Paradise Realty to Gaffey and his wife to be null and void, and ordered that the escrow instructions and deeds held by Arizona Title and Trust Company be executed according to the terms thereof, subject to the trust.

Proof of a constructive trust must be established by clear and convincing testimony. Murillo v. Hernandez, 79 Ariz. 1, 281 P.2d 786. In passing upon the sufficiency of the evidence in Murillo v. Hernandez, we agreed with the statement of the Supreme Court of Utah in Paulsen v. Coombs, 123 Utah 49, 253 P.2d 621, 624, and we quoted the following:

"'The question of whether [the] evidence is sufficient to be clear and convincing is primarily for the trial court; his finding should not be disturbed unless we must say as a matter of law that no one could reasonably find the evidence to be clear and convincing.'" 79 Ariz. at 9, 281 P.2d at 791

Under this rule, looking at the evidence, we cannot say the finding of the court should be disturbed. Uhlmann first points out that the written agreement between King and Ellis executed in February of 1954 which entitled Ellis to fifty per cent of the profits over $12,000 (and its subsequent modification to the figure of $20,000) does not entitle Ellis to a one-half interest in the property. There is no need to discuss this contention because the trial court did not base its findings on this instrument, but did base its findings on the negotiations among Uhlmann, Peil, Ellis.

and King from the time Ellis and Peil made the telephone call to King on February 28, 1956.

Peil testified he talked to King on the telephone in February 1956, the substance of their agreement being that Ellis was to have one-half interest and King would step out of the picture for $20,000 if it would help Ellis. Uhlmann admitted that Peil was his man in this transaction. Peil prepared the quit-claim deed which granted Ellis and his wife a one-half interest in the forty acres for a ten-dollar consideration and also a purchase-option agreement for the remaining one-half for $200 earnest money and a $20,000 purchase price. The Kings did not execute these documents, but King wrote Peil stating that these documents did not conform to his understanding of the telephone conversation. King re-affirmed his position that he was willing to forego any profit to help Ellis, but he was unwilling to leave himself in the situation that these proposed documents would create. King wrote that he thought any quit-claim to Ellis would be delivered when the option was taken up. Uhlmann maintains that this letter refutes any possible contention that King intended Ellis to have a one-half interest in the property. We cannot agree. This letter merely states that King did not want to be put in a position of granting a one-half interest in the property where the only consideration flowing to him would be ten dollars plus the right to keep $200 in earnest money if Ellis did not exercise his option on the remaining one-half within six months.

On March 5, 1956, Peil answered King's letter and apologized for the misunderstanding. With this letter, he sent King the documents of the King-Uhlmann transaction, and told him this transaction would " * * * help George [Ellis] to complete his negotiations, with which you are familiar." Relying upon this assurance, King and his wife executed the documents which constitute the King-Uhlmann transaction. If the defendants believed that King's letter of March 3, 1956, constituted a repudiation of any agreement to sell this property for $20,000 without Ellis attaining a one-half interest therein, then why did Peil insert the above-quoted phrase? There is but one rational explanation. They throughly understood King's March 3, 1956, letter. They knew it was not a repudiation of the telephone agreement that King would sell for $20,000 if Ellis would get a one-half interest in the property, but rather a repudiation of any transaction whereby King would have to look to a one-half interest in the property, subject to an option in Ellis, to secure his $20,000 (especially when there was a mere $200 earnest money involved). It is quite clear to this court, as it was to the trial court, that the understanding of the parties pursuant to the agreement was that King and his wife would convey the land to Uhlmann and his wife for $20,000 if the Uhlmanns would in turn reconvey a one-half interest to Ellis and his wife. This is the only way the proposed King-Uhlmann transaction could " * * * help George [Ellis] to complete his negotiations, with which you are familiar." The only Ellis negotiations with which King was familiar was a transaction which would ultimately result in Ellis's becoming a titleholder of record of a one-half interest in the forty acres so he could borrow against the same.

This interpretation of the facts is further substantiated by the three deeds Peil later drew up concerning portions of the forty acres. These deeds ran from Uhlmann and his wife to Paradise Realty (Peil's organization), and two from Paradise Realty. One of the deeds from Paradise Realty granted Ellis an interest in the forty acres. If defendants believed that the March 3, 1956, letter from King to Peil repudiated any requirement that the $20,000 transfer result in a one-half interest being conveyed to Ellis, then why was Ellis's possible interest ever considered by defendants in the Uhlmann-Peil negotiations after the sale from King to Uhlmann? Uhlmann's answer was that despite the March 3, 1956, letter he was still.

prepared to honor any claim Ellis would produce in the property. Were such an explanation true, its only rational interpretation is that defendants thought they had made such a good deal on the property that a one-half interest therein was easily worth $20,000 and they would not hesitate to convey one-half to any one not an owner of record. Defendant's interpretation is rather doubtful, and the evidence is clear and convincing to support the trial court's finding that at the time of the King-Uhlmann transaction there was an understanding that one-half of the premises would be conveyed to George Ellis, and that:

> "4. At a later period of time, contrary to the agreement and understanding among all the parties, defendant Uhlmann refused to convey to plaintiff George Ellis unless plaintiff George Ellis would produce evidence of title aliunde."

Uhlmann contends error was committed by the erroneous admission of evidence. He claims that the statute of frauds precludes the admission of any oral evidence showing a conveyance of real estate, that the parol-evidence rule was violated because the King-Uhlmann transaction was in writing, and that any evidence in contravention of what appears on the face of these documents violates the parol-evidence rule.

Uhlmann admits that the statute of frauds does not apply to a constructive trust, but says that there was no constructive trust in this case because the trial court by its own findings defined the trust as one formed by the agreement of the parties and thus by legal definition it was an express-parol trust and thus subject to the defense of the statute of frauds. In order to answer this contention, it must first be pointed out that a constructive trust is not a legal relationship, but it is an equitable remedy whereas an express-parol trust is a legal relationship. In Murillo v. Hernandez, supra, we answered a similar contention:

> "The law is settled in this jurisdiction that an express trust based upon an oral promise modifying the terms of a

conveyance absolute upon its face may not be shown. Wright v. Young, 20 Ariz. 46, 176 P. 583. However, when circumstances appear which render it unconscionable for the holder of the legal title to retain and enjoy the beneficial interest, equity, on the theory of an implied fraud, impresses a constructive trust on the property thus acquired in the favor of the one who is truly and equitably entitled to the same. * * *" 79 Ariz. at 6, 281 P.2d at 789.

Because there was an express-parol trust does not preclude plaintiff from the remedy of a constructive trust. It merely means that the defense of the statute of frauds will not be set aside on a mere showing of the express-parol trust, but the plaintiff must show by clear and convincing evidence that he is entitled to the remedy of a constructive trust. The reasoning behind the rule that the statute of frauds does not apply in a suit to impose a constructive trust also applies to the parol-evidence objection. See Snakard v. McLaughlin (Okl.), 351 P.2d 1013; Walter H. Leimert Co. v. Woodson, 125 Cal.App.2d 186, 270 P.2d 95; Davidson v. Streeter, 68 Nev. 427, 234 P.2d 793; Forman v. Goldberg, 42 Cal.App.2d 308, 108 P.2d 983.

Uhlmann recognizes that the constructive trust is an equitable remedy, and states the trial court was in error in applying it in this case because of the defense known as "clean hands." In other words, it is his position that prior to the February 1956 negotiations Ellis had claimed a one-half interest in the property and that this at least was erroneous. Rather than give this contention a lengthy discussion, it will suffice merely to state that there is no evidence of any injury to Uhlmann as a result of Ellis's claims, and there is no evidence of any morally reprehensible intent on the part of Ellis, nor was there anything unconscionable about such claims, whether true or false.

Uhlmann further argues that even under the court's findings this is not a proper case in which to impose a constructive trust because the agreement was entered into in

good faith, thus precluding an actual fraud, and there is no evidence of a constructive fraud.

The record is abundant with facts and testimony which show that Ellis, due to his perilous financial position, had disclosed all his financial interests to defendants, and as they were well aware he certainly was in no position to bargain on an equal footing with any of the parties to the aforementioned negotiations. The record further shows that Ellis placed great confidence in defendants, and by their own admission they were also aware of this fact but did nothing which would have warned him that this confidence was unjustified until Uhlmann refused to make the conveyance previously agreed upon.

In accordance with previous holdings on this subject, in the recent case of Markel v. Phoenix Title & Trust Co., 100 Ariz. 53, 410 P.2d 662, this court said:

"A constructive trust expresses the idea that a defendant is under an equitable duty to give the complainant the benefit of property held. A wrongful holding begs relief whether the type of injustice is old or new regardless of whether actual fraud exists.

" '* * * where actual fraud does not exist in the acquisition of property, a constructive trust will arise whenever the circumstances make it inequitable that the property should be retained by the one who holds the legal title. * * * The forms and varieties of these trusts are practically without limit and the principle is applied wherever it is necessary for the obtaining of complete justice.' Linder v. Lewis, Roca, Scoville and Beauchamp, 85 Ariz. 118, 123, 124, 333 P.2d 286, 290.

"See Bogert on Trusts, § 471, Second edition.

" '* * * A constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title

may not in good conscience retain the beneficial interest, equity converts him into a trustee. * * * A court of equity in decreeing a constructive trust is bound by no unyielding formula. The equity of the transaction must shape the measure of relief.' Cardozo, C. J., in Beatty v. Guggenheim Exploration Co., 225 N.Y. 380, 386, 389, 122 N.E. 378, 380, 381." 100 Ariz. at 58, 410 P.2d at 665

In the case of Condos v. Felder, 92 Ariz. 366, 377 P.2d 305, this court had the problem of determining whether the facts justified a finding of an implied fraud, and in that case adopted language from Bogert on Trusts and Trustees, 1946 Ed., Vol. 3, Part 1, Sec. 482, and quoted the following:

" 'But there are other cases where there is just as great intimacy, disclosure of secrets, intrusting of power, and superiority of position in the case of the representative, but where the law has no special designation for the position of the parties. It cannot be called trust or executorship, and yet it is so similar in its creation and operation that it should have like results.' " 92 Ariz. at 371, 377 P.2d at 308

The evidentiary rules such as the statute of frauds and the parol-evidence rule should not be taken lightly, but under the facts of the instant case, where plaintiff is forced to deal with those who have superiority of position, and he justifiably places his trust in those persons, equity will intervene and impose a constructive trust on the property concerned, where the holder of legal title may not in good conscience retain this interest.

The judgment was not eroneous in that it granted plaintiff a one-half interest in the property as opposed to granting him a judgment for $20,000 as defendant contends. The agreement was for a one-half interest in the property and not for $20,000. The increased value of the property is a benefit to the equitable owners thereof, and plaintiff being an equitable owner to one-half of the property is entitled to the increased value.

Uhlmann also contends that—in accordance with his motion and affidavit filed after trial and knowledge of the holding of the court—the property in question was community property, and his wife, Billie Uhlmann, was an indispensable party; therefore, his motion to dismiss upon these grounds should have been granted. The disposition of this question requires consideration of the pleadings and the facts as developed during the trial. The Ellises, after alleging the facts, pray for relief as follows:

"* * * [T]hat the court adjudge and decree that those certain premises hereinabove described are held in trust by defendant Uhlman subject to plaintiff's rights and interest therein consisting of an undivided one-half interest therein, subject, however, to the right of defendant Uhlman upon any sale thereof agreed to by plaintiff and defendant Uhlman, to receive out of the first sales proceeds thereof the sum of $20,000.00, which said sum is the amount defendant Uhlman advanced or was to advance in order to accede to said King's rights in said premises and under aforesaid contract, and that plaintiff is the equitable and beneficial owner of said right and interest in said premises, and that defendants Gaffey and Piel have no interest therein, and for a declaratory judgment decreeing the rights and interest of the parties hereto in and to aforesaid premises and under and to the aforesaid deeds, for his costs herein incurred, and for such other and further relief as to the court may seem proper."

Defendant Uhlmann, in his answer, generally denied most of the allegations; however, he admitted he had had some dealings and negotiations with plaintiff without stating the nature of the same, and that he had purchased the property from Roy H. King, and

"* * * admits that he claims to be fee owner of the entire premises and admits that he does not recognize and

denies that plaintiff has any interest therein; * * *"

The case then went to trial on the 14th day of December 1959, and on the 16th was submitted to the court for consideration. On October 13, 1960, the court by minute entry set forth certain findings and conclusions, and ordered that upon the presentation and approval of the findings of fact and conclusions of law, judgment would be entered in accordance therewith. Proposed findings of fact and conclusions of law and judgment were submitted by plaintiff in accordance with the court's order. After objections were filed by defendant, on March 10, 1961, defendant Ernest Uhlmann filed his motion to dismiss on the grounds that Billie Uhlmann was an indispensable party. This was the first time he had claimed the property in question was community property. While the escrow and the deeds which were introduced in evidence contained the names of both Ernest Uhlmann, and Billie Uhlmann, his wife, the case went to trial upon the allegation that defendant Uhlmann claimed title in fee simple. As a basis, this question turns upon the interpretation of § 33–452, which reads as follows:

"A conveyance or incumbrance of community property is not valid unless executed and acknowledged by both husband and wife, except unpatented mining claims which may be conveyed or incumbered by the spouse having the title or right of possession without the other spouse joining in the conveyance or incumbrance." 11 A.R.S. § 33–452

It is evident that the legislature intended to prevent a husband from conveying or encumbering community property unless it was executed and acknowledged by the wife, the object of which is apparent —to prevent the husband from defrauding the wife.

It is the contention of plaintiff that the Uhlmanns hold the premises as constructive trustees for the benefit of Ellis; that title to the property passed subject to the constructive trust and was not a conveyance

or encumbrance of the community property; and that the rights obtained for the community were subject to the constructive trust. We have previously held, in Shreeve v. Greer, 65 Ariz. 35, 173 P.2d 641, that the husband has the right to enter into a contract on behalf of the community for the purchase of property, and that it is not necessary for the wife to join in signing this contract. We said:

"* * * Heap, as head of his community, was lawfully entitled to act for and on behalf of it and bind it. Section 63–303, A.C.A.1939; La Tourette v. La Tourette, 15 Ariz. 200, 137 P. 426, Ann. Cas.1915B, 70; Bristol v. Moser, 55 Ariz. 185, 99 P.2d 706; Vol. I, sections 113–116, Principles of Community Property (de Funiak). Any contract he made looking toward the purchase of the real estate was presumably a contract made for the community and its benefit. * * *" 65 Ariz. at 40, 173 P.2d at 645

This court thereby clearly held that the signature of the wife is not necessary in an agreement to buy community property. In the instant case the husband had an absolute right to negotiate the purchase of the property with community funds without the approval of his wife, in which event any interest which he validly acquired in the property was a community-property interest. Shreeve v. Greer, supra. The question then is —what did the community acquire by the negotiations of the husband?

The courts generally hold that similar statutes do not apply to invalidate purchase agreements made by the husband in behalf of the community which result in the acquisition of encumbered property. The test is whether the property is encumbered at the time or before its acquisition. The wife is not a necessary party if the encumbrance is made before or at the time of acquisition. It is unnecessary for the wife to join with her husband in the execution of an instrument by which an interest in real property is acquired, and the husband—as manager or agent—can purchase real property subject to liens for the community. Munger v. Boardman, 53 Ariz. 271, 88 P.2d 536; Intermountain Realty Co. v. Allen, 60 Idaho 228, 90 P.2d 704, 122 A.L.R. 647.

In Morgan v. Firestone Tire & Rubber Co. et al., 68 Idaho 506, 201 P.2d 976, the husband had made a contract to purchase certain realty for the community. As part of the consideration for the contract, the husband was to lease back the property to the seller. The seller breached the contract, claiming it was void because the wife must sign any contract to encumber community realty and the lease was such an encumbrance. The court held:

"Section 31–913, I.C.A., prior to 1945 amendment, effective when the transaction was made, provided:

" 'Husband's control of community property.—The husband has the management and control of the community property, except the earnings of the wife for her personal services and the rents and profits of her separate estate. But he can not sell, convey or encumber the community real estate unless the wife join with him in executing and acknowledging the deed or other instrument of conveyance, by which the real estate is sold, conveyed or encumbered.'

"The provision relative to the husband's management and control makes him the agent and trustee for the marital community. Kohny v. Dunbar, 21 Idaho 258, 121 P. 544, 39 L.R.A.,N.S., 1107, Ann.Cas.1913D, 492. As such manager he may purchase with community funds, property which upon acquisition is community property under Sec. 31–907, I.C. A.

"It is unnecessary for the wife to join with her husband in the execution of an instrument by which community real property is acquired. Intermountain Realty Co. v. Allen, 60 Idaho 228, 90 P. 2d 704, 122 A.L.R. 647.

* * * * * *

"* * * The husband, as manager of or agent for, the community, can purchase real property which is subject to

liens, reservations and exceptions. See Munger v. Boardman, 53 Ariz. 271, 88 P.2d 536, at page 538. Such dealings are not prohibited by the statute. It is only after the community once acquires title that he cannot under Sec. 31–913, I.C.A., supra, convey or encumber the community property without the wife joining with him in the execution and acknowledgment of the instrument of conveyance or encumbrance. While the rule is well settled that the character of community property is fixed at the time of its acquisition and the wife's interest vests at that time (Pendleton v. Brown, 25 Ariz. 604, 221 P. 213; McDonald v. v. Lambert, 43 N.M. 27, 85 P.2d 78, 120 A.L.R. 250; In re Woodburn's Estate, 190 Wash. 141, 66 P.2d 1138), it is not so fixed, nor does the wife have any interest therein, until the time of acquisition." 201 P.2d at 980.

Uhlmann states in his brief that "The wife is an indispensable party in an action seeking to impose a lien on community real property." The difficulty with this statement of counsel, in the instant case, is that plaintiff is not seeking to impose a lien on community property. The whole case rests upon a constructive trust which the court found existed in favor of Ellis at the time of the transaction. Uhlmann seeks to support his position by citing Washington cases—namely: Northwest Bridge Company v. Tacoma Shipbuilding Company, 36 Wash. 333, 78 P. 996; Powell v. Nolan, 27 Wash. 318, 67 P. 712, 68 P. 389; Peterson v. Dillon, 27 Wash. 78, 67 P. 397; Sagmeister v. Foss, 4 Wash. 320, 30 P. 80, 744; Littell & Smythe Mfg. Company v. Miller, 3 Wash. 480, 28 P. 1035; Collins v. Snoke, 9 Wash. 566, 38 P. 161.

All of these cases involve the foreclosure of mechanics' liens. These liens were placed on the property after title was acquired by the community, which is a different fact situation from the one in the instant case, and therefore they are not applicable and are clearly distinguishable. He likewise cites some Idaho cases—Civils v. First National Bank (1925), 41 Idaho 690, 241 P. 1023, and Gerken v. Davidson Grocery Company (1931), 50 Idaho 315, 296 P. 192. These cases, like the Washington cases, are for the foreclosure of mechanics' liens placed upon the property by the husband after it was acquired by the community, and, like the Washington cases, are not applicable and are distinguishable from the case at bar.

However, even in the case of a foreclosure of a mechanics' or materialmen's lien, the authorities are divided. The majority rule is that the wife does not have to be made a party to the suit. In Yearout v. American Pipe & Steel Corporation, 74 Cal.App.2d 139, 168 P.2d 174, which was a foreclosure of a materialmen's lien against the husband only for debt which the husband had contracted in behalf of the community for material used upon the premises, the court—in setting forth the majority rule—held:

"The case of Cutting v. Bryan, 206 Cal. 254, 274 P. 326, 327, involved a question quite similar to the one confronting us here where the wife was not made a party, but her husband was, in an action involving community property. It was there said:

" 'The fact that the plaintiff was not expressly made a party to the action which had theretofore been commenced and was being prosecuted in the federal court does not, in our opinion, militate against the application of the foregoing principle, for the reasons set forth in certain of the cases above cited, and for the additional reason that the husband of the plaintiff was the principal party defendant in said action, and as such was representing the community interest of himself and also of his wife in said property, and that as to such interest the plaintiff herein was in privity with her husband, and was represented in said action by him as fully as though she had been expressly made a party thereto. McKay on Community Property, (2d Ed.) § 1085; 13 Cal.Juris., p. 882;

Estate of Clark, 190 Cal. 354, 212 P. 622; Lichty v. Lewis, C.C., 63 F. 535; Id., 9 Cir., 77 F. 111, [23 C.C.A. 59].'

"Mr. Associate Justice Preston wrote a concurring opinion in the Cutting case and referred generally to the fact that the 'Washington courts have declared the wife a necessary party in any action respecting the community real property, and that a judgment against the husband alone is void,' and concluded those cases were not controlling in California, thus showing that the Washington rule was called to the attention of the Justices. It is significant that they refused to follow it and did not consider it of sufficient importance to discuss it in the majority opinion.

"The same question was before the court in Secondo v. Superior Court, 105 Cal. App. 179, 286 P. 1089, 1090, where it was said:

" 'As to her community interest, the wife is in privity with her husband, who, in actions involving the property, fully represents both their interests, and she is not a necessary party thereto. Cutting v. Bryan, 206 Cal. 254, 274 P. 326; 31 Cor.Jur., Husband and Wife, § 1270, p. 160.'

"Under this rule we must hold that Anna V. Yearout was not a necessary party to the action to foreclose the materialman's lien on the community property as she was represented there by her husband. Therefore the judgment foreclosing the lien was binding on her and neither she nor her husband can successfully maintain this action." 168 P.2d at 176

In the instant case, the husband had complete control of the community property, and had a right to purchase real property. The only limitation in the handling of this community property was that of his right to encumber the same. The question of encumbering the community property is not involved in the instant case. The sole question involved pertains to what he acquired as manager of the community

property. The transaction involved a purchase and not a conveyance on the part of Uhlmann.

Ulhmann agreed as part of the transaction that a one-half interest would go to Ellis; therefore, when the title to the property passed it was instantaneously subject to this trust, the same as the property in Morgan v. Firestone Tire & Rubber Co. et al., supra, was instantaneously subject to the lease. The reasoning of the Morgan case not only shows that the Uhlmanns acquired property, one-half of which was subject to a trust in Ellis's favor, but it further disposes of any arguments that Billie Uhlmann had special rights concerning the property because of A.R.S. § 33–452. This statute only governs the conveyance or encumbrance of realty *after* it vests in the community. The one-half interest belonging to Ellis never vested in the Uhlmann community because a constructive trust arose at the time of the conveyance to the Uhlmanns.

A constructive trust is declaratory of the rights and interests at the time of the questioned transaction, and it reverts back to the time of the transaction which gave rise to the constructive trust. See Smith v. Connor, 87 Ariz. 6 at 21, 347 P.2d 568; Trusts & Trustees, Bogert, 2d Ed., § 472, p. 11. From the time of the transaction Uhlmanns held a one-half interest in the property in trust for Ellis. Therefore, Billie and Ernest Uhlmann were community owners of their one-half interest in the property, but not of the whole property. Ernest Uhlmann negotiated the purchase which he, as manager of the community, had a perfect right to do, and his actions as manager of the community were binding upon both himself and his wife. In accord with Morgan v. Firestone Tire & Rubber Co., supra, if, as stated in the motion after trial, it was community property, she had a community interest in the one-half which the court found to have passed to the Uhlmanns. Se never acquired a community interest in the one-half held in trust for Ellis, for this was held in

trust from the date of its acquisition and therefore it never became community property. Since Uhlmann was acting as manager for the community his wife was neither an indispensable nor necessary party needed to represent the community fully. The community was bound by the acts of the manager.

 It is a well-established principle of law that property held in trust is not community property. Dreher v. Rohrmoser, 134 Cal.App.2d 196, 285 P.2d 285; Mell v. Shrader, 33 N.M. 55, 263 P. 758; Pappas v. Taylor, 138 Wash. 22, 244 P. 390. In Mapel v. Starriett, 28 N.M. 1, 205 P. 726, the court said:

"* * * The district court found * * * that Starriett was trustee of a resulting trust. Such being the case, neither he nor his wife, nor the community, had any beneficial estate or interest in the property, and his wife's signature was not necessary to the transfer or conveyance of it. * * *" 205 P. at 727

 Uhlmann's next contention concerning the indispensable-party issue is based upon the fact that Billie was a named grantee in the King-Uhlmann transaction, and she was a titleholder of record. It is nowhere contended that Billie Uhlmann could have any rights in this property other than those acquired by the husband. As to the community interest of the wife, it is in privity with that of her husband, and in this action which determined what that interest was, the husband fully represented both his and the community interests, and in her role as a member of the community she is not an indispensable party thereto. She was entitled to a community interest in whatever interest he acquired. In Bolin v. Superior Court, 85 Ariz. 131, 333 P.2d 295, this court made the following statements, quoting from Barron & Holtzhoff, Federal Practice and Procedure, Vol. 2, Sec. 512, pp. 58 and 59:

"'* * * The test of indispensability therefore is whether the absent person's interest in the controversy is such that no final judgment or decree can be entered which will do justice between the parties actually before the court, without injuriously affecting the rights of others not brought into the action.'" 85 Ariz. at 134, 333 P.2d at 297

The facts in the instant case show that this judgment would not injuriously affect Billie Uhlmann's rights. Her rights were derivative in that she took a one-half interest in whatever property rights Uhlmann acquired as a result of the transaction. As previously stated, a constructive trust relates back to the date of the transaction, and there is no way Billie Uhlmann could have acquired any claim to Ellis's one-half interest which would be superior to Ellis's because all interests were fixed at the time of the transaction. Therefore it follows that because her rights are those acquired by her husband, there can be no injurious effect as a result of her not being specifically joined as party to this action.

Uhlmann's other contention concerning the issue of the indispensability of Billie Uhlmann is based upon a claim that the court lacked jurisdiction to render a judgment against Ernest A. and Billie Uhlmann concerning the tract of land because Billie Uhlmann was not a party to the action. The judgment in the instant case is against the community. There was no error committed because Billie Uhlmann's name was mentioned in this judgment, as her name is not used to refer to her individually, but merely to identify the community. By the very nature of a constructive trust, and the facts of the acquisition of this property, the community had its day in court through the husband's representation. It is not possible to foresee how the prior addition of Billie Uhlmann as a named party defendant could have possibly altered any of the issues, or added or subtracted therefrom, in determining the outcome of this litigation, insofar as the judgment holding the existence of a constructive trust is concerned.

The facts show Billie Uhlmann took no part in the transaction in acquiring the property. It was all handled by Ernest Uhlmann. He alleged in his answer "to be a fee owner

of the entire premises." At the conclusion of the trial the court took the case under advisement. On October 13, 1960, it made a minute entry of its findings of fact and conclusions of law providing for a constructive trust on an undivided one-half interest in favor of plaintiff George Ellis, preserving, however, a lien in the sum of $10,000 upon plaintiff Ellis's one-half interest for sums advanced by defendant Uhlmann, and ordered that upon the presentation, approval, and signing of findings of fact and conclusions of law, judgment would be entered accordingly. As previously stated, in compliance with the order of the court, Ellis submitted findings of fact, conclusions of law, and a judgment. Defendants submitted objections to the proposed findings, conclusions, and judgment.

The motion of Ernest Uhlmann to dismiss on March 10, 1961, upon the ground that the court did not have jurisdiction for the reason that the property was community property of Ernest A. Uhlmann and Billie Uhlmann, his wife, was a shift in the position taken by Ernest Uhlmann that he was owner in fee simple, and was only made long after he had full knowledge of the holding of the court.

■ Under either of these representations, the court had jurisdiction to enter judgment, holding that Ellis had a constructive trust interest subject to the lien for $10,000. If the property was, as claimed by Uhlmann throughout the trial, his separate property the court would have jurisdiction to enter the judgment. On the other hand, if it were community property, as alleged in the motion of Ernest Uhlmann, it likewise had jurisdiction to enter judgment against the community.

In the case of Morgan v. Bruce, 76 Ariz. 121, 259 P.2d 558, we held:

"We are thus presented with the problem of determining the rights of defendant Bruce under the assignment from her husband. The husband has exclusive control and is the agent of the community in the management of the community personalty, La Tourette v. La Tourette, 15 Ariz. 200, 137 P.2d 426; and independent of the wishes of the wife (in the absence of fraud upon her) he can subject the community property to the payment of community debts. Cosper v. Valley Bank, 28 Ariz. 373, 237 P. 175; First Nat. Bank of Mesa v. Reeves, 27 Ariz. 508, 234 P. 556. So far as her community property interests are concerned, she is bound by his transactions. Shreeve v. Greer, 65 Ariz. 35, 173 P.2d 641. In such transactions the husband for such purpose is not only agent for the community but he is agent for his wife. Atkins v. Dodds, Tex.Civ.App., 121 S.W.2d 1010; cf. Loveland v. Ingle, Tex.Civ.App., 230 S.W. 1054. When the husband is the agent of the wife, she is charged with and has notice of all matters of which the husband has notice. 26 Am.Jur., Husband and Wife, Section 230, Page 840; 41 C.J.S. Husband and Wife § 512, p. 1091. * * *" 76 Ariz. at 125, 259 P.2d at 560

■ Under the facts of the case, Billie Uhlmann could only have acquired an interest in the property through her agent Ernest Uhlmann. It is a well-settled principle of law in this state that property acquired by either or both of the spouses during coverture is presumed to be community property. This is true regardless of which spouse's name appears on the title. Evans v. Evans, 79 Ariz. 284, 288 P. 2d 775; Smith v. Smith, 71 Ariz. 315, 227 P.2d 214; Porter v. Porter, 67 Ariz. 273, 195 P.2d 132; Blaine v. Blaine, 63 Ariz. 100, 159 P.2d 786; Greer v. Goesling, 54 Ariz. 488, 97 P.2d 218; Lovin v. Woodward, 45 Ariz. 105, 40 P.2d 102. As set forth in Morgan v. Bruce, supra, Billie Uhlmann had notice of all the matters of which the husband had notice.

In Munger v. Boardman, supra, in which the wife acting as an agent for the community in promising to pay a mortgage on property purchased by her for the community, we said:

"It will not do for defendant Charles P. Munger to say.he did not participate in

the negotiations concerning the property. His wife was his or the community's agent in buying the property and in every step thereafter, and all her acts and admissions and representations and agreements were the acts, admissions, representations and agreements of the community.

"Under the law, neither spouse may encumber, by mortgage or lease or otherwise, or sell or dispose of community realty without the consent of the other. It is necessary that they join in any such transaction affecting realty of the community. Defendant seems to be laboring under the belief that the agent of the community (Edna A. Munger), in seeking and securing from the owners of the mortgage an extension of time for foreclosing it, thereby encumbered the property. This is not so in fact or in law. She gave no mortgage. She placed no encumbrance upon the property. The mortgage was on the property when the community bought it, and all the community did was to ask for time in which to pay the obligation and it was granted to them upon the condition that they assume the payment of the note and mortgage.

\* \* \* \* \* \*

"\* \* \* The husband may not claim the benefits of the contract and repudiate the burdens. \* \* \*" 53 Ariz. at 277, 280, 88 P.2d at 538, 539

Under the facts of the instant case, Billie Uhlmann's rights could not be injuriously affected by not being a party to the action. If the property were separate property of Ernest Uhlmann, as alleged in his answer, she would not be injuriously affected by not being joined as a party. If the property were community property, then she was represented by her agent Ernest Uhlmann. Morgan v. Bruce, supra. The most that she could claim would be an interest in the property as her separate property. This is not an issue in the case. However, an undivided one-half interest remains in the Uhlmanns under the judgment of the lower court. Whatever right she may have acquired in the property was acquired by the acts of her agent. Ernest Uhlmann. She is bound by his acts. Munger v. Boardman, supra.

For the foregoing reasons, the judgment of the lower court is affirmed.

UDALL, V. C. J., and ANTHONY T. DEDDENS, Superior Court Judge, concur.

NOTE: Justice LORNA E. LOCKWOOD having announced her disqualification the Honorable ANTHONY T. DEDDENS, Judge of Superior Court in Cochise County, was called to participate in the determination of this appeal.

BERNSTEIN, Justice (dissenting).

I must disagree with the majority's disposition of the instant case.

At the outset it is necessary to set forth a short description of the posture of this case. In his complaint, the plaintiff, Ellis, alleged that King had conveyed land to Uhlmann in consideration of the payment of $20,000, and the oral promise that Uhlmann would reconvey an undivided one-half interest in the property to Ellis; that Uhlmann refused to reconvey the property to Ellis, and therefore Ellis asked that a constructive trust be imposed on the one-half interest in which he claimed an equitable interest. Uhlmann's answer denied that Ellis had any interest in the property. Although the deed from King named both Ernest Uhlmann and his wife, Billie, as grantees, nevertheless Ellis failed to join Billie Uhlmann as a party defendant. The trial court, sitting without a jury, found for Ellis and imposed a constructive trust on a one-half interest in the property.

The majority of this court holds in part that Billie Uhlmann

"\* \* \* never acquired a community interest in the one-half held in trust for Ellis, for this was *held in trust from the date of its acquisition and therefore it never became community property.*" (Emphasis added.)

Furthermore, the majority holds that since the imposition of a constructive trust on the one-half interest in the property held for the benefit of Ellis precludes any community property interest from vesting in the Uhlmanns, it was therefore unnecessary to join Billie Uhlmann as a defendant.

I do not agree. In my opinion Billie Uhlmann was an indispensible party, and consequently failure to join her was fatal. Bolin v. Superior Court, 85 Ariz. 131, 333 P.2d 295; Howard v. Luke, 18 Ariz. 563, 164 P. 439. Let us examine the defect in the majority's reasoning.

Crucial to their decision is the statement that a constructive trust fixes the title to the property at the time of its acquisition. Yet the majority fails to recognize that this is merely a legal fiction. See Healy v. Commissioner of Internal Revenue, 345 U.S. 278, 73 S.Ct. 671, 97 L.Ed. 1007. The majority, in the name of equity and justice, employs this legal fiction as a means to an inequitable and reprehensible end. It is their premise that property acquired subject to a trust never becomes community property, citing Dreher v. Rohrmoser, 134 Cal.App. 2d 196, 285 P.2d 285 (purchase money resulting trust); Mell v. Shrader, 33 N.M. 55, 263 P. 758 (express trust); Pappas v. Taylor, 138 Wash. 22, 244 P. 390 (constructive trust based on actual fraud); Mapel v. Starriett, 28 N.M. 1, 205 P. 726 (purchase money resulting trust). These cases relied on by the majority have one factor in common; they either deal with express trusts or purchase money resulting trusts in which the trustee clearly has knowledge at the time of acquisition that he is a trustee. Using the premise that the status of property becomes fixed as of the date of its acquisition the majority reaches the erroneous conclusion that Billie Uhlmann need not be joined as a party defendant. The basis for the result in the cases cited by the majority can be found in the language of the California court in the case of In re Raphael's Estate, 115 Cal.App.2d 525, 252 P.2d 979 (purchase money resulting trust).

"Since the referee was entitled to conclude that Raymond held only the *naked legal title* * * * as trustee for Harry there was *no substantial property interest in Raymond which could become the community property of Raymond and Bertha* under their transmutation agreement." 252 P.2d at 984. (Emphasis added.) Obviously the California court holds that ownership in the form of mere legal title in property is insufficient to render that property part of the community. Rather the community must acquire equitable or beneficial ownership of the property in order to obtain an interest.

However, we have often stated that our community property law is most similar to that of the state of Washington, and for that reason we have consistently followed the Washington cases. Donn v. Kunz, 52 Ariz. 219, 79 P.2d 965; Cosper v. Valley Bank, 28 Ariz. 373, 237 P. 175. Indeed, in Conley v. Moe, 7 Wash.2d 355, 110 P.2d 172, 174, 133 A.L.R. 1089, the Washington court stated what I believe to be the better rule.

"It is * * * well settled in this jurisdiction that the status of property, whether real or personal, becomes fixed as of the date of its purchase or acquisition, and remains so fixed unless changed by deed, by due process of law, or by the working of some form of estoppel. In Re Deschamps' Estate, 77 Wash. 514, 137 P. 1009; In re Woodburn's Estate, 190 Wash. 141, 66 P.2d 1138; In re Finch's Estate, 198 Wash. 567, 89 P.2d 218; and Binge v. Mumm, Wash., [5 Wash.2d 446,] 105 P.2d 689.

"The foregoing specific rule enunciated in the cases cited and followed in other cases from this court particularly refers to the *legal title* to the property, and not directly to such interests or rights as are founded upon equitable considerations. In quite a number of our cases, which announce and follow the rules stated above, the rule is conceded that the legal title may be subject to certain

equities, according to the facts and circumstances of the particular case." (Emphasis added.)

The Washington court looks to whether the community acquires the legal title, and if it does, the property is presumed to be community property.

In the instant case the deed specifically named Ernest Uhlmann and his wife Billie as grantees and, since all property acquired during coverture is presumed community property, the wife must be joined as a party. The record is clear that Uhlmann paid the $20,000 purchase price for the property and therefore, was certainly not a strawman. In addition, it may be noted that the trial court expressly found that the agreement between the parties was made in good faith.

At this point it is necessary to pose a hypothetical case in order to analyze the majority's conclusion that property acquired subject to a contructive trust vests no interest in the community. This can best be illustrated by what I believe to be an analogous situation when dealing with a suit to compel conveyance of the property. Let us assume that the evidence of the promise to convey the one-half interest in the property to Eillis was clear and convincing. Further let us assume that this real property had always been the community property of the Uhlmanns. Would Billie Uhlmann have to be joined as an indispensible party to enforce Ellis' claim to the one-half interest in the property?

A.R.S. § 33–452 has a direct bearing on the resolution of this issue. It provides in part:

"A conveyance or incumbrance of community [real] property is not valid unless executed and acknowledged by *both husband and wife* * * *" (Emphasis added.)

A suit in equity to compel delivery of a deed has as its objective the compulsion of those parties who are required to convey. Since A.R.S. § 33–452 invalidates a conveyance of community real property unless both spouses execute and acknowledge the instrument of conveyance, it is obvious that both marital partners must be joined in a suit to compel the conveyance of the property. Because the majority of this court relies on the conclusion that the community only has an interest in property in which it has acquired equitable rather than legal title the result may well lead to an emasculation of A.R.S. § 33–452.

The basis of the majority's rationale is the splitting of the concept of title into two compartments; one equitable, the other legal. Unfortunately, such an analysis leads to an unwise result. For example, once a purchase contract for realty is executed the doctrine of equitable conversion operates so that the seller merely retains legal title and the buyer acquires equitable title. See Smith v. Tang, 100 Ariz. 196, 412 P.2d 697; Lebrecht v. Beckett, 96 Ariz. 389, 396 P.2d 13; Strahan v. Haynes, 33 Ariz. 128, 262 P. 995; Shreeve v. Greer, 65 Ariz. 35, 173 P.2d 641. Certainly the wife's indispensibility cannot depend on whether the property is being acquired or conveyed. To follow the majority opinion to its logical conclusion would mean that where partners in the marital community decide to sell a parcel of real property the wife need only execute and acknowledge the purchase and sale contract. For once the contract is signed equitable title would no longer be in the community, and in a subsequent suit to compel conveyance of the deed joinder of both spouses would be unnecessary. Such a result, however, is clearly unwarranted in light of the mandate of A.R.S. § 33–452, which requires the wife to execute and acknowledge the conveyance. A conveyance is manifested by a deed.

The purpose of A.R.S. § 33–452 is not merely, as the majority states, to prevent the husband from defrauding the wife, but also to recognize the equality of the wife's rights in the disposition of the community real property. As we said in Shaw v. Greer, 67 Ariz. 223, 228, 194 P.2d 430, 433.

"Our married woman statutes and community property laws were adopted for the purpose of establishing equality between husband and wife. Our community property law was conceived in honesty; its policy is to give to the *wife* in the marital community an equal dignity with the husband and to make her an equal factor in the matrimonial gains." (Emphasis added.)

The wife's rights in the marital community would be reduced to a nullity if a suit to compel conveyance of a deed to real property could foreclose her rights in the property without an opportunity to defend her rights. If the wife has a valid defense to the enforcement of the contract to convey, and she need not be joined in the suit, she certainly will not be able to bring her defense to the attention of the court.

In addition to the defect of the majority's distinction between legal and equitable title, is their failure to recognize a basic legal concept. In the instant case the deed from King to Uhlmann expressly named Uhlmann's wife, Billie, as a grantee. Where the wife is a named grantee she must be joined as a party before any of her rights in the property can be affected. Oliver v. Oliver, 216 Ga. 757, 119 S.E.2d 348; Lunsford v. Witt, 309 S.W.2d 348 (Ky.); Dane v. Daniel, 23 Wash. 379, 63 P. 268. To deprive Billie Uhlmann of her day in court amounts to a taking of her property without due process of law.[1] For without Billie Uhlmann's presence the trial court was without jurisdiction to proceed to judgment in this case.

The majority relies on Munger v. Boardman, 53 Ariz. 271, 88 P.2d 536, to conclude that Ernest Uhlmann was the agent for the community in purchasing the property, and consequently Billie Uhlmann was bound by his acts. However, Munger v. Boardman, supra, is completely distinguishable from the case before us. In that case the evidence clearly established that Mrs. Munger

was in the real estate business, operated the business independent of her husband in the manner of a feme sole, and received an extension of time for foreclosing a mortgage on property which she had purchased subject to the mortgage. The record in that case revealed sufficient facts to warrant the conclusion that the wife was the husband's agent for the community. Yet in the instant case the record is completely devoid of a scintilla of evidence indicating that Ernest Uhlmann had any authorization to act as Billie Uhlmann's agent in dealing with the community property. In any event, Munger v. Boardman, supra, cannot support the majority's conclusion that Billie Uhlmann need not be joined as a party, for in the Munger case both spouses were joined as parties defendant.

Finally, the majority concludes that the trial court had jurisdiction to enter judgment ordering Ernest and Billie Uhlmann to convey the one-half interest to Ellis. They hold that no error was committed because the judgment was not used to refer to Billie Uhlmann individually, but merely to identify the community. How the trial court can enter judgment against the community when the majority states that the property never became community property completely escapes my comprehension.

For these reasons I would reverse the judgment of the trial court for failure to join Billie Uhlmann as an indispensible party.

STRUCKMEYER, Justice (dissenting).

In my opinion, the judgment of the superior court is flagrantly void for want of due process.

Although Billie Uhlmann, wife of Ernest A. Uhlmann, was named as a grantee in the deed by which the property was conveyed in fee simple, she was not named as party in the lawsuit, never made a party by service of process, and did not appear in the action. Notwithstanding, the court be-

---

1. See Justice Struckmeyer's dissent.

low entered this personal judgment against her:

"IT IS HEREBY ORDERED, ADJUDGED AND DECREED that defendants Ernest A. Uhlmann *and Billie Uhlmann,* his wife, hold an undivided one-half interest in the premises hereinafter described for the benefit of plaintiff George Ellis * * *." (Emphasis supplied.)

That an in personam judgment may not be rendered against one who has never been a party to the litigation would seem so obvious that citation of authority should be unnecessary.

"It is a principle of general application in Anglo-American jurisprudence that one is not bound by a judgment in personam in a litigation in which he is not designated as a party or to which he has not been made a party by service of process. Pennoyer v. Neff, [5 Otto 714,] 95 U.S. 714, 24 L.Ed. 565; 1 Freeman on Judgments, 5th ed. § 407. A judgment rendered in such circumstances is not entitled to the full faith and credit which the Constitution and statute of the United States, R.S. § 905, 28 U.S.C. § 687, 28 U.S.C.A. § 687 prescribe, [citations] and judicial action enforcing it against the person or property of the absent party is not that due process which the Fifth and Fourteenth Amendments require. [Citations.]" Hansberry v. Lee, 311 U.S. 32 at 40–41, 61 S.Ct. 115, 85 L.Ed. 22, 132 A.L.R. 741.

I concur with Justice BERNSTEIN in his analysis of the erroneous reasoning by which the majority arrive at their ultimate conclusion. I cannot, however, pass on without expressing one further thought. The most elemental considerations of fair play require that no person lose his property without the opportunity to be heard. The court-conceived assumption that a wife is represented by her husband, although the husband in fact disclaims such a representation, works a virtual destruction of the concept of community property as it is known in Arizona. Its effect is to reduce the wife's

one-half vested share in the community to a mere nominal interest. Today women in Arizona are relegated to a second-class status comparable only to the Middle Ages.

I must dissent.