468 P.2d 568

**DOUGLAS INVESTMENT COMPANY, Appellant,**

v.

**C. E. VAN NESS, Appellee.**

**No. 9660.**

Supreme Court of Arizona, In Banc.

April 27, 1970.

Rehearing Denied May 26, 1970.

---

Lewis, Roca, Beauchamp & Linton, by John P. Frank, Phoenix, for appellant.

Moore, Romley, Kaplan, Robbins & Green, by Elias M. Romley and Neal Kurn, Phoenix, for appellee.

McFARLAND, Justice.

This is an appeal from the Maricopa County Superior Court wherein that court, sitting without a jury, entered judgment in favor of the plaintiff-appellee, C. E. Van Ness (Van Ness) and against the defendant-appellant, Douglas Investment Company (Douglas).

This litigation evolved from a prior transaction between the parties. Van Ness was sole owner of Arizona Title Guarantee and Trust Company (Arizona Title). On May 12, 1960, a contract was executed whereby he sold to Douglas 1,750 shares of the 2,000 total shares of stock of Arizona Title for $1,000 per share; a total of $1,750,000. Douglas, however, was desirous of seeing an audit of the company before it consummated the deal. No audit was available, but Van Ness—apparently eager to conclude the transaction—provided a financial statement which showed that Arizona Title had a book net worth in the sum of $796,596.50, and Van Ness, as part of the agreement, personally warranted, in writing, that amount to Douglas.

Some two months later—in early July—a trusted employee and officer when Arizona Title was in the ownership of Van Ness disclosed that he had embezzled a substantial sum which a subsequent audit determined to be $417,018.06. The audit also revealed that, separate and apart from the embezzlement, a series of errors and uncollectible debts further reduced the net worth by another $207,628.13. Van Ness was called upon to personally make good the deficiency in accordance with his warranty. A series of negotiations and transactions then occurred, including the recovery of $204,395.71 from the embezzler, and Van Ness turning over to Douglas his remaining 250 shares of stock at the agreed-upon purchase price of $1,000 per share. These transactions culminated with Van Ness making good the deficiency.

Throughout these protracted and rather complex arrangements, Douglas claims, and subsequent facts prove, that it was purchasing only nine per cent of the stock for itself and the remaining ninety-one per cent for its principal, Christiana Oil Corporation (Christiana). There is a sharp conflict in the facts as to whether it was a disclosed or an undisclosed principal which has a bearing on the question raised by Douglas, claiming that Christiana should have been joined as an indispensable party in Van Ness's action.

The event which forms the crux of this matter occurred in 1961 when the United States Treasury Department granted certain tax allowances to Arizona Title, based on the embezzlement and other deficiencies. The potential amount of the allowances was $196,498.12, although at the time of judgment $30,718.44 was still in dispute, a fact which the trial judge took into consideration.

Van Ness instituted his suit in 1962, claiming that the actual deficiency that he paid in 1960 should reflect a reduction in the above amount, and the overpayment, resulting from a mutual mistake in fact, should be returned to him. The trial court entered judgment on January 30, 1967, in favor of Van Ness and against Douglas in the amount of $165,779.68, plus six per cent interest from September 26, 1960, the date of overpayment; and the court retained limited jurisdiction to enter a further judgment for the disputed tax allowance in the amount of $30,718.44, or such lesser sum as might be recovered under the same interest terms.

Because of the complexity of the transactions, pertinent findings of fact and conclusions of law are set forth to supplement the foregoing "thumbnail" sketch.

### "Findings of Fact

\* \* \* \* \* \*

"3. Plaintiff and defendant were the sole parties to the Agreement and both intended and did become personally liable to each other for all obligations arising therefrom.

\* \* \* \* \* \*

"9. At a meeting on September 26, 1960 defendant signed and delivered to plaintiff a letter of the same date, which was approved by plaintiff, stating, among other things, that the report of Ernst & Ernst 'establishes *a liability on your part* [*plaintiff*] *to Douglas Investment Company under the warranties* of your contract dated May 10, 1960, of $579,646.19.' This total consisted of: (a) the $159,395.71 in property recovered from the embezzler referred to in finding 8, supra, and (b) the $420,250.48, the sum total of the net figures appearing in findings 7 and 8, supra ($207,-628.13 for bad debts PLUS $212,622.35 embezzlement loss). The defendant in said letter then called upon plaintiff to purchase from Arizona Title, for $159,-395.71, the property recovered from the embezzler and, for $100.00, some worthless accounts; and, *in said letter defendant also requested that plaintiff issue his check to defendant* in the amount of $420,250.48. Plaintiff complied with both requests. [Emphasis added.]

"10. When the checks were issued and delivered by plaintiff to defendant on September 26, 1960:

"(a) Plaintiff and defendant assumed and believed that the deficiencies in the warranted book net worth of Arizona Title as of April 30, 1960, or the sum required 'to cover deficiencies in the net worth' of Arizona Title on said date, amounted to $420,250.48;

"(b) Plaintiff did not intend or want to pay to defendant, and defendant did not intend or want to collect from plaintiff, any more or any less than the amount to which defendant was entitled, nor any more or any less than the amount required 'to cover deficiencies in the net worth' of Arizona Title as of April 30, 1960;

"(c) Plaintiff and defendant assumed and believed that plaintiff had been given credit for all items to which plaintiff was entitled; and

"(d) Plaintiff and defendant recognized and agreed that the payment of $420,250.48 was not a final payment but was a temporary or interim one only, and that it was made pursuant to the statements and understandings among the parties that (i) the plaintiff would be refunded the amount of any overpayment, and (ii) the plaintiff would further pay the amount of any underpayment or deficit.

"11. When plaintiff issued and delivered his check to defendant for $420,250.48 on September 26, 1960, plaintiff and defendant were both in fact mistaken as to the amount of the actual deficiency in the warranted book net worth of Arizona Title as of April 30, 1960.

The actual deficiency, being also the amount required 'to cover deficiencies in the net worth' of Arizona Title as of April 30, 1960, was $223,752.36, a sum of $196,498.12 less than the assumed deficiency of $420,250.48.

"12. The mistake amounting to $196,498.12 referred to in finding 11, supra, occurred as the result of the failure of plaintiff and defendant, in calculating that the assumed deficiency amounted to $420,250.48, to take into consideration and to give effect to the following facts, viz:

"(a) The adjustment of $207,628.13 for bad debts (finding 7) and the remaining embezzlement loss of $212,622.35 (finding 8) aggregated $420,250.48; of this amount, $399,248.76 constituted a net operating loss for income tax purposes and gave rise to the tax benefits noted below;

"(b) The $61,689.22 accrued for State and Federal income taxes on January 1 through April 30, 1960 net income of Arizona Title (finding 2) would not have to be paid, and should therefore have been eliminated as a liability, thereby increasing the net worth as of April 30, 1960 by the sum of $61,689.22;

"(c) The remaining portion of the net operating loss for tax purposes in the amount of $272,948.31 ($399,248.76 MINUS $126,300.45) was subject to a claim for refund under the carryback provisions of the Federal income tax law for the years 1957, 1958 and 1959 and under the carryback provisions of the Arizona income tax law for the year 1959, resulting in a refund of $134,808.90, calculated as follows:

| Year | Applicable Tax Law | Amount of Carryback | Amount of Refund |
|---|---|---|---|
| 1957 | Federal | $146,743.34 | $ 70,806.54 |
| 1958 | Federal | 94,489.59 | 43,634.59 |
| 1959 | Federal | 31,715.38 | 16,492.00 |
| 1959 | State | | 3,875.77 |
| | | $272,948.31 | $134,808.90 |

"[The 1959 Federal taxable net income was $160,739.46 on which a tax of $78,084.52 was paid; however only $31,715.38 of said net income, on which the tax amounted to $16,492.00, was subject to a refund under the carryback provisions for net operating losses existing as of April 30, 1960.]; and

(d) The potential tax refund of $134,808.90 was properly includible as an asset on the Financial Statements, thereby increasing the net worth as of April 30, 1960 in the sum of $134,808.90; and it was an asset in said amount as of said date.

"The sum total of the foregoing tax benefits) Paragraph (b) PLUS Paragraph (c), supra, is $196,498.12; they were not taken into consideration or otherwise given effect in calculating the assumed deficiency in net worth.

&ast; &ast; &ast; &ast; &ast; &ast;

### "CONCLUSIONS OF LAW

"A. A person who has entered into a contract binding upon him and has paid money to the other party thereto under an erroneous belief induced by a mistake of fact that the terms of the contract required such payment, is entitled to restitution from the other, except where the mistake is only as to the time of payment.

"B. A person who has paid to another an excessive amount of money because of an erroneous belief induced by a mistake of fact that the sum paid was necessary for the discharge of a duty is entitled to restitution of the excess.

"C. A person who has paid to another an amount of money pursuant to an understanding that the payment was not final and would be later adjusted as to amount in the event he overpaid or in the event he underpaid, is entitled to a refund in the amount of the overpayment.

"D. Plaintiff is entitled to recover from defendant the $196,498.12 he overpaid to defendant on September 26, 1960,

plus interest thereon from the date of said overpayment at the rate of six per cent per annum, plus costs to be taxed and allowed as provided by law."

Ten questions are presented in Douglas's brief, broken into seventeen parts—many of which constitute a mere re-argument of the factual issues. Basically, Douglas claims that the court erred in its findings that there was a mutual mistake, and that Van Ness's payment was not a final transaction, but was subject to future adjustments pursuant to a verbal agreement; that the court lacked jurisdiction because of the failure to join indispensable parties; that the imposition of interest was improper and that there were several procedural errors.

■ It is true that there was sharp conflict in the evidence as to whether the parties were mistaken about the actual amount of the deficiency and equally divisive testimony concerning the verbal understanding that Douglas would refund any overpayment and in the event of an underpayment Van Ness would make a further payment. But it is because of this very conflict that this Court, on an appeal, will not substitute its judgment for that of the trier of fact. Gilliland v. Rodriquez, 77 Ariz. 163, 268 P.2d 334. In Kauffroath v. Wilbur, 66 Ariz. 152, 185 P. 2d 522, this Court said:

"Defendant's third assignment of error, 'That the verdict is not sustained by the weight of the evidence' is likewise without merit. This court is not the trier of the facts. It is of no moment that had we been the jury we might well have decided the other way. Assignments of error based upon the weight of evidence cannot be considered if there is any evidence to support the trial court's finding even though the weight of the evidence be against that finding. Garlington v. McLaughlin, 56 Ariz. 37, 104 P.2d 169; Ruth v. Rhodes, [66] Ariz. [129], 185 P.2d 304, and cases cited therein."

The record here indicates that there was ample evidence to support the findings of the trial judge.

■ Douglas, in a "shotgun-type" assault on this basic issue, also pleads the parol-evidence rule, accord and satisfaction, waiver and estoppel. Brushing aside these incidental arguments, it appears that it was not even necessary to find a verbal understanding to support the claim of Van Ness. The hard core of the whole matter is that Van Ness, by his written warranty, purely and simply agreed to restore Douglas to the financial position it would have occupied had the financial statement been accurate to the penny—no more, no less. Had the statement been correct there would have been no payments required of Van Ness, and no tax allowance for Arizona Title. As the situation turned out, Van Ness was obliged to honor his warranty. After his payment to Douglas, had a further deficit been discovered, Van Ness, by the very nature of his agreement, would have been called upon for an additional payment to bring the net assets up to the agreed figure. Conversely, if by virtue of a tax return, the entire amount paid by Van Ness was not necessary to put the net worth at the required sum, then the amount of overpayment was not within the purview of the warranty and equitably must be refunded.

In Wallace v. First National Bank, 39 Ariz. 451, 7 P.2d 586, this Court stated:

" * * * We think the situation justified the application of the maxim 'equity regards the substance rather than the form,' as explained in 21 Corpus Juris 204, 205, § 200:

" 'This maxim is as applicable at the present time as it was when it was first formulated. By force of its principle equity goes behind the form of a transaction in order to give effect to the intention of the parties, either to aid in (an) act abortive at law because formally defective, or to impose a liability as against an evasion by a formal concealment of its true character. In the construction of a written instrument, equity always attempts to get at its substance, and to ascertain, uphold, and enforce the rights and duties that spring from the real intention of the parties. In doing so, while it will of course not change the words of the instrument, the court of equity will look into all the circumstances under which it was made, in order to determine the proper meaning of the transaction. It will do this not only to sustain a just claim but to defeat an unlawful demand.' "

See also Merryweather v. Pendleton, 91 Ariz. 334, 372 P.2d 335.

This maxim was well described as:

" * * * equity looks to the substance and not the shadow, to the spirit and not the letter, in a case made appropriate by the facts, * * * It seeks justice rather than technicality, truth rather than evasion, common sense rather than quibbling."

—State v. Tyler County State Bank (Tex.Com.App.) 282 S.W. 211, on rehearing of 277 S.W. 625

It is a mathematical fact here that the tax allowance in the sum of $196,498.12, which was based on the same deficiency which compelled Van Ness to abide by his warranty, when added to the payment made by Van Ness, brings the warranted net worth up to a figure exactly $196,498.-12 more than the agreed amount. It is equally certain that such was not the intent of the parties.

The appellant asserts that the court lacked jurisdiction because of the failure to join, as defendants, Christiana, Arizona Title and a company called First American Title & Insurance Company (First American) which eventually purchased, by a stock transaction, Arizona Title from Christiana and Douglas.

Van Ness argues that Douglas raised this matter in the trial court by motion filed over four years after the complaint, and after the statute of limitations had allegedly run against the other parties. He con-

cludes that even if the other parties are indispensable Douglas should be equitably estopped from raising this defense. There is merit to this argument, although it has been held that this defense can be raised for the first time as late as on appeal. Siler v. Superior Court, 83 Ariz. 49, 316 P.2d 296; City of Flagstaff v. Babbitt, 8 Ariz.App. 123, 443 P.2d 938. In 2 Barron & Holtzoff, Federal Practice and Procedure, § 512 at pages 98–99, it is stated:

> "Indeed there are even cases, paradoxical as it may seem, which refuse to order the joinder of indispensable parties. In the leading such case the Second Circuit refused to require joinder of a party defendant, though noting that it would normally consider him indispensable, because of his inequitable conduct, saying: '* * * the general principle has long been recognized that, as the object of the rule respecting indispensable parties is to accomplish justice between all the parties in interest, courts of equity will not suffer it to be so applied as to defeat the very purposes of justice.' There is special reason so to liberalize the rule in circumstances where a party is considered indispensable, not for his own protection, but because it is thought unfair to the existing parties to proceed in his absence. If the existing parties have themselves been culpable, as by delaying raising the objection until so late a date that joinder of the missing party will cause undue delay and expense, it seems proper for the court to do without the missing party. Such a result can be explained either by saying that the usually indispensable party is not indispensable under the peculiar circumstances of the case, or, more forthrightly, by tempering the rule of required joinder of indispensable parties with equitable considerations."

However, it is not necessary to determine if Douglas slept on its rights since we agree with the trial court that the above-mentioned companies were not indispensable parties. In the finding of fact No. 3, the court stated:

> "3. Plaintiff and defendant were the sole parties to the Agreement and both intended and did become personally liable to each other for all obligations arising therefrom."

There is more than sufficient evidence in the record to support this finding, and, as we said earlier in this opinion, we will not substitute our judgment for that of the trier of fact if there is any evidence to support the finding of fact. Gilliland v. Rodriquez, supra; Kauffroath v. Wilbur, supra. Furthermore, as we previously stated, Van Ness warranted to pay to Douglas only such a sum as would be required to bring the book net worth up to the agreed amount. Douglas made demand for the amount of the deficiency and Van Ness made payment directly to Douglas. The reciprocal obligation to repay the overpayment is with Douglas and only Douglas.

In King v. Uhlmann, 103 Ariz. 136, 437 P.2d 928, this Court, in discussing indispensable parties, adopted the definition as set forth in 2 Barron & Holtzoff, Federal Practice and Procedure, § 512 at pages 95 and 96, as follows:

> "* * * The classic definition of indispensable parties by the Supreme Court is: 'Persons who not only have an interest in the controversy, but an interest of such a nature that a final decree cannot be made without either affecting that interest, or leaving the controversy in such a condition that its final termination may be wholly inconsistent with equity and good conscience.' This definition is frequently repeated. Thus it is said that the test of indispensability is whether the absent person's interest in the controversy is such that no final judgment or decree can be entered which will do justice between the parties actually before the court, without injuriously affecting the rights of others not brought into the action. * * *"

In the instant case no injury to the rights of absent parties has been brought to the attention of this Court or the trial court, and we are of the opinion that the judg-

ment entered did do "justice between the parties actually before the court."

Douglas claims it was error for the trial judge to permit Van Ness to amend the complaint at the conclusion of the trial by adding a paragraph specifically pleading the oral agreement for reimbursement between parties.

■ In view of our opinion that the existence of such agreement, in addition to the written warranty, was not a critical prerequisite to recovery by Van Ness such amendment could not be prejudicial error. Furthermore, the amendment merely conformed the pleading to the evidence received during the course of the trial. Douglas did not plead surprise or ask for a continuance in order to prepare to meet this evidence. The action of the court was proper within the provisions of Rule 15(b), Rules Civ.Proc., 16 A.R.S. A similar situation arose in In re Estate of McCauley, 101 Ariz. 8, 415 P.2d 431, wherein this Court said:

"Proponent urges that the trial court's order granting this motion to amend was erroneous. For several reasons we disagree. First, the alleged lack of timeliness of contestants' motion is not a proper ground for denying it inasmuch as Rule 15(b) expressly provides that such motion may be made by any party at any time 'even after judgment.' * * *

*   *   *   *   *   *

"Finally, proponent has failed to show how the amendment to conform to proof would prejudice, i. e., surprise, him in maintaining his defense on the merits as Rule 15(b) required him to do. Since the bulk of the testimony showing proponent's fraudulent representations to decedent was contained in depositions, including some which proponent himself set and noticed, it is difficult to see how he did not have notice that this proof would be introduced at trial and that he would be required to meet it. Rule 15 (b) itself provides protection for a litigant who is surprised by proof offered at trial. He can object to the introduction of such evidence on the ground that it is not within the issues and if he satisfies the court that he would be prejudiced in presenting his case on the merits by the admission of such evidence, he may ask the court to grant a continuance to enable him to meet such evidence. * * *"

■ Douglas next contends that the granting of interest from September 26, 1960–the date of the overpayment–was error in that Van Ness's claim was unliquidated at that time. With this we agree. Not only was it unliquidated, but the very existence of a claim obviously was unknown to the parties at that time.

Van Ness properly states in his brief that " * * * equitable principles are applied to determine when interest begins to run." But equity is a two-way street. "He who seeks equity must do equity" is a cardinal principle. 30 C.J.S. Equity § 90. We do not believe it was within the contemplation of the parties that any overpayment–or underpayment, for that matter–would bear interest from date any more than we believe that it was the intent that the overpayment would not have to be returned.

It would be more in keeping with the equities in this case that the interest run from the date that the tax refunds became available to Arizona Title. To this extent the judgment must be modified.

The remainder of Douglas's allegations of error relate to trial procedure and evidence. We have reviewed them all, and find them to be without merit as constituting reversible error.

The judgment of the Superior Court is affirmed as modified, and the matter remanded for further proceedings not inconsistent with this opinion.

LOCKWOOD, C. J., STRUCKMEYER, V. C. J., and UDALL and HAYS, JJ., concur.