IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

RABA KISTNER, INC.,
*Plaintiff/Appellee/Cross-Appellant,*

*v.*

CONNECT 202 PARTNERS, LLC, et al.,
*Defendants/Appellants/Cross-Appellees.*

No. 1 CA-CV 24-0072

FILED 04-02-2026

Appeal from the Superior Court in Maricopa County
No. CV2019-013828, CV2020-000440
The Honorable Danielle J. Viola, Judge

**AFFIRMED IN PART; REVERSED IN PART; VACATED IN PART;
AND REMANDED**

COUNSEL

Lewis Roca Rothgerber Christie LLP, Phoenix
By Susan M. Freeman, Robert F. Roos, Adam T. Reich, Brooks Brennan
*Counsel for Defendants/Appellants/Cross-Appellees*

Holden Willits PLC, Phoenix
By Robert G. Schaffer, Michael J. Holden, Kevin M. Estevez
*Co-Counsel for Plaintiff/Appellee/Cross-Appellant*

Duane Morris LLP, Austin, Texas
By Benton T. Wheatley (*Pro Hac Vice*), James V. Earl (*Pro Hac Vice*)
*Co-Counsel for Plaintiff/Appellee/Cross-Appellant*

---

**OPINION**

Judge David B. Gass delivered the opinion of the court, in which Presiding Judge Brian Y. Furuya and Chief Judge Randall M. Howe joined.

---

**G A S S**, Judge:

¶1        A deal is a deal, especially in Arizona—a right to contract state. With no significant overriding public policy considerations, Arizona holds parties to their deals. No such considerations apply to the terms of the deal here—a five-year, multi-million-dollar, commercial contract between two sophisticated commercial entities. The court thus holds the parties to the deal's express terms.

¶2        Raba Kistner, Inc. wants to avoid being held to the terms of the deal—a professional services agreement (the Agreement) it made with Connect 202 Partners, LLC. For almost two years, Raba overbilled Connect. When Connect identified the overbilling during a contractually authorized audit, Connect clawed back the overpayments by reducing its later payments to Raba. Raba sued, arguing in key part: (1) it did not overbill Connect under the Agreement, and (2) even if it did overbill Connect, the superior court should allow Raba to keep Connect's overpayments under the voluntary payment doctrine. The superior court correctly ruled Raba overbilled Connect, a ruling Raba does not challenge on appeal. The superior court then ruled Connect did not have the right to audit Raba's billing statements after it paid them, so Raba was entitled to recover the clawed-back overpayments under the voluntary payment doctrine. Connect appealed that ruling and others. Raba cross-appealed on other grounds, including equitable estoppel.

¶3        Because the superior court correctly found that the undisputed evidence did not support Raba's equitable estoppel claim, the court affirms that ruling. The court reverses the superior court's ruling in Raba's favor on the voluntary payment doctrine. The court thus vacates the superior court's ruling on the payment bond, the award of attorney fees and costs, and the judgment. With that, the balance of Raba's cross-appeal issues are moot. The court thus remands to the superior court to consider Connect's claims for attorney fees and costs and its claims under the payment bond.

**FACTUAL AND PROCEDURAL HISTORY**

¶4   The Agreement arises out of an Arizona Department of Transportation project to extend State Route 202 to link Interstate 10 south of Phoenix to I-10 west of Phoenix. The Loop 202 South Mountain Freeway Project extended State Route 202 by adding a 22-mile divided highway south and west of South Mountain Park, allowing traffic to bypass downtown Phoenix.

¶5   The Department retained Connect to design and build the Project and then maintain it for 30 years. A detailed contract governed the relationship between the Department and Connect. That contract required Connect to subcontract with others to provide quality assurance services for the Project. Connect entered the Agreement so Raba would provide those quality assurance services, including Raba's certification to the Department that it had inspected Connect's work for compliance.

¶6   The parties entered the almost 100-page Agreement after extensive negotiations. Connect agreed to pay Raba a contract price "not-to-exceed" $26,208,854 for providing services, most of which were labor costs. This appeal focuses on the details underlying the labor multiplier and Connect's audit rights.

**I.**  **Raba agreed it would bill the labor multiplier for regular hours but not overtime hours.**

¶7   Connect agreed to pay Raba for its direct labor costs hourly, using a labor multiplier to compensate Raba for other indirect costs such as taxes, insurance, overhead, benefits, and profit. The Agreement's labor multiplier was 2.21 for the first 40 hours an employee worked each week. The Agreement included an example applying the labor multiplier: "Labor charges reimbursable by [Connect] for a [Raba] employee with actual W-2 earnings of $10 per hour would be $22.10 per hour."

¶8   In negotiations leading up to the Agreement, Raba also *wanted* the labor multiplier to apply to overtime hours, but Connect wanted the labor multiplier to apply only to the first 40 hours an employee worked each week. Connect's view ultimately prevailed, and the Agreement expressly did not apply the labor multiplier to overtime hours. Instead, the Agreement said "overtime labor [will] be treated as follows. The [2.21] specified Labor Multiplier shall be applied to the straight-time labor rate only, eliminating the premium portion from the calculation. The premium

portion of overtime labor shall be paid with no mark-up." Schedule B to the Agreement included an example showing how the labor multiplier applied to a non-exempt Raba employee who works 50 hours in a single week. Schedule B showed the labor multiplier would apply to the first 40 hours, but would not apply to the 10 hours of overtime.

## II. Under the Agreement, Raba must maintain certain records so the parties can exercise their audit rights.

¶9        At the superior court, Raba argued the Agreement did not give Connect the right to audit Raba's billing statements. Connect disagreed. The superior court concluded the Department had the right to audit Raba, but it ruled Connect did not have that right.

¶10        The Agreement says the labor multiplier "shall be determined and documented in accordance with the provisions" in Part III, Section 24.0. Part III, Section 24.1 says:

> Contractor shall maintain all records and accounts pertaining to Work performed on other than a solely lump sum basis for a period of at least five (5) years after final payment. Company, Owner and/or FHWA shall have the right to audit, copy and inspect said records and accounts at all reasonable times during the course of such Work and for the above five (5) year period for the purpose of verifying costs incurred.

¶11        The Agreement defines Contractor as Raba, Company as Connect, and Owner as the Department. The Agreement thus says "[Connect], [the Department,] and/or FHWA shall have the right to audit, copy and inspect said records and accounts at all reasonable times during the course of such Work and for the above five (5) year period for the purpose of verifying costs incurred." Section 24.3 adds Connect's audit rights "include the right to observe the business operations of [Raba] and its Subcontractors to confirm the accuracy of Books and Records."

## III. After six months, Raba begins overbilling Connect by applying the labor multiplier to overtime.

¶12        Under the Agreement, Raba submitted monthly invoices to Connect and Connect would make monthly progress payments to Raba. The Agreement required Raba to certify its invoices to show the work was complete, correct, and authentic. Connect had the right to make "partial or

provisional payment on an invoice in dispute, pending audit and reconciliation of the total charge."

¶13        As the superior court found, Raba's first six invoices did not include any overtime labor. Starting with Raba's seventh invoice, Raba applied the labor multiplier to overtime. Connect representatives (including Connect's quality manager, contracts manager, and project director) approved the invoices, and Connect paid them.

## IV.    Through an audit, Connect discovered Raba's overbilling and took corrective action.

¶14        About two years into the Agreement, Connect realized Raba likely would exceed the not-to-exceed price. As a result, Connect audited Raba's past invoices and learned Raba had been billing (and Connect had been paying) the labor multiplier on overtime. Connect sent Raba a letter identifying the incorrect invoicing for the labor multiplier on overtime and requested a meeting. For several months, Raba continued to submit invoices to Connect applying the labor multiplier to overtime. Connect ultimately sent Raba a letter saying, through the rest of the project, Connect would withhold payments from Raba for the amount Raba overbilled for overtime.

¶15        Connect also began a claw-back process for the amounts it already paid Raba for the labor multiplier on overtime. In that process, it clawed back an additional $1,950,000 ($350,000 for five months and $200,000 for one month).

## V.    Raba sued Connect and Connect counterclaimed.

¶16        In its amended complaint, Raba asserted these claims against Connect: breach of contract, breach of the implied covenant of good faith and fair dealing, violation of Arizona's prompt pay act for Department construction contracts under A.R.S. §§ 28-411.C and -6924.A.2, a claim against Connect's payment bond, declaratory judgment, and an alternative claim for unjust enrichment. Connect counterclaimed, alleging breach of contract and the implied covenant of good faith and fair dealing. Connect also sought declaratory relief. In answering Connect's counterclaim, Raba asserted the voluntary payment doctrine as an affirmative defense.

**VI.    On summary judgment, the superior court concluded Connect did not have audit rights under the Agreement and awarded Raba $1,950,000 in clawed-back monies under the voluntary payment doctrine.**

¶17    Connect and Raba filed competing motions for summary judgment. Raba sought summary judgment on (1) its breach of contract, payment bond, and declaratory relief claims against Connect; and (2) Connect's counterclaims alleging breach of contract, declaratory relief, and good faith and fair dealing. Connect sought summary judgment on (1) Raba's claims against Connect's claims (declaratory relief, breach of contract, good faith and fair dealing, prompt payment act, payment bond, and unjust enrichment); and (2) Connect's counterclaims.

¶18    As a matter of contract interpretation, the superior court analyzed the Agreement's terms and ruled the labor multiplier did not apply to overtime hours, saying it "only applies to the first 40 hours of straight time labor and not to any overtime." The superior court then found the voluntary payment doctrine applied to the $1,950,000 claw-back amount. The superior court reasoned Connect had no contractual obligation to make the payments to Raba under the Agreement and Connect "had every opportunity to know that Raba was applying the labor multiplier to overtime hours," given the detail in Raba's invoices. In that process, the superior court ruled Connect did not have audit rights and even if it did, it does not mean Raba waived the voluntary payment doctrine under the Agreement (including the audit, review, and back charge provisions). It then rejected Connect's argument about paying the invoices under duress because of time pressures created under Arizona's prompt payment act for Department construction contracts.[1] For the amounts Connect withheld after identifying the overbilling ($630,089.98), the superior court found the voluntary payment doctrine did not apply because Connect had not actually paid that money to Raba.

¶19    The superior court rejected Raba's equitable estoppel claim for the withheld amount because Raba did not change its position once Connect began withholding the monies in January 2019. For that reason, Raba could not show Connect caused Raba any harm. Connect acted consistent with the Agreement when it stopped paying the labor multiplier

---

[1] As discussed below, Arizona has two prompt pay acts, one applies just to the Department's construction contracts under A.R.S. § 28-411, and one generally applies to all other construction contracts under A.R.S. §§ 32-1181 to -1188.

overtime hours. The superior court also found Raba could not show the reliance required for an equitable estoppel claim. Based on those rulings, the superior court concluded Connect was entitled to summary judgment on Raba's good faith and fair dealing, prompt pay act, and unjust enrichment claims.

¶20        After subsequent motion practice, the superior court *sua sponte*—and over Connect's objection—granted Raba summary judgment on Connect's good faith and fair dealing claim, based on the voluntary payment doctrine. In doing so, the superior court concluded the voluntary payment doctrine was a complete bar to Connect's recovery of the monies it clawed back, even if the overpayments resulted from Raba's breach of the implied covenant or other inequitable conduct and because Connect's implied covenant claim sought the same damages as its express breach of contract claim.

¶21        In addressing the parties' competing claims for an award of attorney fees and costs under A.R.S. § 12-341.01 and the payment bond, the superior court granted Connect's application related to claims not at issue in this appeal and denied the rest of both parties' applications. After the superior court entered final judgment, Raba moved to alter or amend it, challenging the superior court's determination Raba was not entitled to attorney fees or prejudgment interest. The superior court denied Raba's requested relief.

¶22        The court has jurisdiction over Connect's timely appeal and Raba's timely cross-appeal under Article VI, Section 9, of the Arizona Constitution and A.R.S. §§ 12-120.21.A.1 and -2101.A.1.

## DISCUSSION

¶23        Summary judgment is appropriate when "the facts produced in support of the claim or defense have so little probative value, given the quantum of the evidence, that reasonable people could not agree with the conclusion advanced by the proponent of the claim or defense." *Orme Sch. v. Reeves*, 166 Ariz. 301, 309 (1990); Ariz. R. Civ. P. 56(a) ("The court shall grant summary judgment if the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law."). Interpretation of a contract is a question of law, which the court reviews *de novo*. *Powell v. Washburn*, 211 Ariz. 553, 555–56 ¶ 8 (2006).

I.        **Two undisputed facts control the outcome of this appeal: (1) The Agreement did not allow Raba to charge the labor multiplier on**

**overtime hours; and (2) the Agreement gave Connect the right to audit Raba's bills and Connect's progress payments.**

¶24 As to the first undisputed fact, the superior court issued a detailed minute entry ruling on the competing motions granting them in part and denying them in part. As a matter of contract interpretation, the superior court analyzed the Agreement's terms and ruled the labor multiplier does not apply to overtime hours, saying it "only applies to the first 40 hours of straight time labor and not to any overtime." Raba does not challenge that ruling on appeal.

¶25 As to the second undisputed fact, Connect has the right to audit Raba's bills under the Agreement. True, the superior court concluded the Department, but not Connect, had the right to audit Raba. Connect challenges that conclusion based on the Agreement's express terms. The Agreement's terms support Connect's challenge. The Agreement says Connect, the Department, and FHWA each "have the right to audit, copy and inspect said records and accounts at all reasonable times during the course of such Work and for the above five (5) year period for the purpose of verifying costs incurred." Raba's answering brief is silent on the issue. Instead, Raba argues the Agreement's audit provisions do not affect Raba's claim under the voluntary payment doctrine. The court rejects that argument in section II.D below. Because the Agreement's terms support Connect's argument and Raba does not challenge that argument, that undisputed fact stands.

¶26 Based on those two undisputed facts, Raba had no right to be paid the labor multiplier on overtime hours. And to the extent Connect paid the labor multiplier on overtime hours, it could rely on its audit rights to recover the overpayments.

¶27 Those points establish that Connect had a valid restitution claim to recover the overpayments. Arizona law and the Restatement align on the validity of Connect's restitution claim. As the Restatement says, "Mistaken payment of money not due presents one of the core cases of restitution, whether liability is explained by reference to the transferee's unjustified enrichment or to the transferor's unintended dispossession. Such a payment gives rise to a *prima facie* claim in restitution . . . ." Restatement (Third) Restitution and Unjust Enrichment § 6 cmt. a (A.L.I. 2011).

¶28 Because Connect has a valid restitution claim for the overpayments, Raba must overcome it by showing "the setting [is] one in

which opposing principles—representing fundamental limits to recovery in restitution—are simultaneously applicable." *Id.*

**II.** **The terms of the Agreement must control unless Raba can identify a significant overriding public-policy consideration requiring the court to override the parties' bargain.**

¶29 Raba argues the voluntary payment doctrine is a significant overriding public policy. It is not.

**A. The voluntary payment doctrine does not apply broadly to every voluntary overpayment.**

¶30 The voluntary payment doctrine has a long history in Arizona. In 1914, the Arizona Supreme Court applied the equitable voluntary payment doctrine to a party who sought restitution for voluntary payments the party made knowing it was not obligated to make those payments. *Merrill v. Gordon*, 15 Ariz. 521, 532 (1914). *Merrill* explained, "Except where otherwise provided by statute, a party cannot by direct action or by way of set-off or counterclaim recover money voluntarily paid with a full knowledge of all the facts, and without any fraud, duress, or extortion, although no obligation to make such payment existed." *Id.* (quoting 30 Cyc. 1298); *accord Moody v. Lloyd's of London*, 61 Ariz. 534, 540 (1944) (same); *Wood v. Nw. Hosp., LLC*, 249 Ariz. 600, 604 ¶ 14 (App. 2020) (same).

¶31 That said, application of the voluntary payment doctrine depends on the facts of the case, not a blind application of the doctrine, especially when the payment is made in the context of a contract. *See, e.g., Douglas Inv. Co. v. Van Ness*, 105 Ariz. 541, 545 (1970) (recognizing party could recover overpayment if the parties understood a payment could "be later adjusted as to amount in the event [the person] overpaid"); *Ali v. Sitts*, 1 Ariz. App. 439, 444 (1965) (recognizing the voluntary payment doctrine did not apply to a commercial tenant's lease overpayments).

¶32 The Restatement recognizes the limitations of the voluntary payment doctrine, as has Arizona. The Restatement says:

> The rule appears in frequent judicial statements to the effect that "money voluntarily paid with knowledge of the facts cannot be recovered back." Statements of this kind must be treated with caution. In a business setting, it is at least paradoxical to suppose that the overpayment of an asserted (or any payment of a nonexistent) liability could ever be

"voluntary," and the proper operation of the voluntary payment rule must be realistic rather than artificial.

Restatement (Third) Restitution and Unjust Enrichment § 6 cmt. e (A.L.I. 2011).

¶33 Consistent with the Restatement, Arizona courts have expressed doubt about applying the voluntary payment doctrine in a business setting involving progress payments. *See Ali*, 1 Ariz. App. at 444. As the court said 60 years ago in *Ali*:

> If it be that the . . . payments can be classified in their entirety as voluntary payments without any right of off-set, then no one would be safe if that person paid any sum before the exact amount due became fixed or if payment was made before the due date or perhaps until sued, the matter reduced to judgment and the judgment had become final.

*Id.* Just as *Ali* was skeptical that any business could safely make progress payments "before the exact amount due became fixed," so is the court here. And the court's skepticism rises when those payments are subject to contractual audit rights and based on billing statements from the other party.

**B. The Parties' freedom to contract significantly limits when the voluntary payment doctrine will apply.**

¶34 Arizona considers private parties' freedom to contract a foundational common-law principle and a paramount public policy. *Zambrano v. M & RC II LLC*, 254 Ariz. 53, 58 ¶ 10 (2022). For that reason, the court must honor it unless the contract term is unconscionable, illegal, or contrary to public policy. *Id.* ¶ 12.

¶35 Arizona's commitment to parties' freedom to contract is rooted in its Bill of Rights. *See* Ariz. Const. art. II, § 25. Article 2, Section 25 says, "No bill of attainder, ex-post facto law, or law impairing the obligation of a contract, shall ever be enacted." *Id.* A parties' freedom to contract is a "paramount public policy." *Zambrano*, 254 Ariz. at 58 ¶ 10. The court upholds the freedom to contract unless specific circumstances, such as legislative prohibitions or overriding public policy considerations, demand limitations on contractual terms. *See id.* ¶ 11 (considering whether implied warranty of workmanship and habitability is waivable).

¶36      The court hesitates to declare contract terms unenforceable on public policy grounds, but it will do so in rare cases when enforcement would injure the public welfare. *Id.* at 58 ¶ 11. The court will not infringe on parties' freedom to contract for terms they choose unless those terms violate legislation or "when an identifiable public policy clearly outweighs enforcement." *Id.* The court "will not refuse to enforce a contract merely because one party made a bad deal, even when the terms are harsh." *Id.* ¶ 10 (citations omitted). The court presumes "parties are best situated to decide whether contractual terms are beneficial, especially in commercial settings." *Id.* ¶ 11.

¶37      In identifying those rare cases, the court balances the interests in enforcing contractual terms against public policy concerns. *Id.* To protect the parties' bargained-for expectations while ensuring contracts do not harm public welfare or violate established legal principles, the court will enforce contract terms unless they are unconscionable, illegal, or contrary to public policy. *Id.* at 59 ¶ 12.

¶38      To identify the relevant public policy, the court examines Arizona's constitution, legislation, and judicial decisions. *Id.* ¶ 11. In *Zambrano*, the Arizona Supreme Court held a new home builder to the implied warranty of workmanship and habitability despite the builder's efforts to use express contract terms to avoid it. *Id.* at 64 ¶ 36. *Zambrano* considered several overriding bases, including the unequal bargaining power between new homebuyers and new homebuilders and sellers. *Id.* at 61 ¶ 21. It also emphasized public policy considerations, including protecting homebuyers from latent construction defects, could override the ability of parties to contract on terms that would vitiate those public policies. *Id.* at 61–64 ¶¶ 24–36.

¶39      Arizona has recognized other limited times when the court will override the parties' express contract terms. *See, e.g.*, *Dobson Bay Club II DD, LLC v. La Sonrisa de Siena, LLC*, 242 Ariz. 108 (2017) (voiding contractual late fee term as an unenforceable penalty because contract remedies should be compensatory, not punitive); *CSA 13-101 Loop, LLC v. Loop 101, LLC*, 236 Ariz. 410 (2014) (holding parties could not prospectively waive statutory rights protecting public interests, including the right to have the fair market value of property credited against debt obligations); *Am. Fed'n of Lab. v. Am. Sash & Door Co.*, 67 Ariz. 20 (1948) (acknowledging the State may limit freedom to contract based on its interest of public health, safety, and welfare); *Green Cross Med., Inc. v. Gally*, 242 Ariz. 293 (App. 2017) (ruling contracts are enforceable unless the acts to be performed are illegal or contrary to public policy, or if the legislature demonstrated its intent to

prohibit enforcement); *Nickerson v. Green Valley Recreation, Inc.*, 228 Ariz. 309 (App. 2011) (recognizing the court may invalidate contracts if they are oppressive or unconscionable).

### C. The voluntary payment doctrine does not override Connect's right to audit the progress payments to address Raba's bills in which Raba applied the labor multiplier to overtime hours.

**¶40** The Agreement's express terms gave Connect the right to audit Raba's invoices. Both Raba and Connect negotiated the Agreement's terms, terms beneficial to both. The resulting Agreement is more than 100 pages long. The Agreement's terms expressly did not allow Raba to bill for a labor multiplier on overtime. Raba did so anyway. Connect paid those bills until it audited them using its contractual audit rights and identified the discrepancy.

**¶41** With that understanding, neither *Merrill* nor any other Arizona case expressly addresses how to apply the voluntary payment doctrine when the parties contractually allocate the risk of an overpayment through an audit procedure. But Arizona has addressed the allocation of risk when a party makes progress payments. *See Douglas Inv. Co. v. Van Ness*, 105 Ariz. 541, 545 (1970). As *Van Ness* said, "A person who has paid to another an amount of money pursuant to an understanding that the payment was not final and would be later adjusted as to amount in the event [the person] overpaid or in the event [the person] underpaid, is entitled to a refund in the amount of the overpayment." *Id.* Consistent with *Van Ness*, when a contract explicitly allocates the risk of overpayment of progress payments, the party overpaying may recover the overpayment even without audit rights.

**¶42** And five years before *Van Ness*, the court reached the same conclusion when it considered progress payments in *Ali*:

> Under the . . . arrangement in effect . . . , there was no legal obligation . . . to make any payments until the final returns on each crop had been calculated. Under these circumstances it can be said that in a sense . . . payments [made] before a due date . . . were voluntarily made. To hold that one who makes advanced payments in relation to an obligation which is unascertained only in the amount and as to the date that the payment became due, thereby makes such payments 'voluntary' which cannot be off-set against the debt when it becomes due would be harsh indeed. The character of the

obligation under the written lease was the same as the character of the obligation under the verbal arrangement, namely an obligation to pay rent for the use of the land.

1 Ariz. App. at 444. Here, though Connect had to make monthly payments, the parties agreed Connect had the contractual right to audit those payments and make appropriate adjustments.

**¶43** A comparison to a recent case in which the court applied the voluntary payment doctrine further makes this point. In *Wood*, a hospital and a doctor entered a multi-year contract in which the hospital agreed to pay the doctor annually based on the number of procedures the doctor performed at the hospital that year. 249 Ariz. at 602–03 ¶¶ 5–6. The *Wood* court concluded the voluntary payment doctrine prevented the hospital from recovering its overpayment under the contract with the doctor. *Id.*

**¶44** This case leads the court to a different result because of crucial differences from *Wood*.

- The *Wood* contract was subject to an annual compensation cap. *Id.* at 603 ¶ 8. Here, the Agreement had an overall, but not annual, compensation cap.

- The hospital maintained the records of how many procedures the doctor performed, evaluated whether the doctor exceeded the compensation cap for that contract year, and calculated the amount it owed the doctor. *Id.* at 602–03 ¶¶ 6–7, 9. Here, Raba kept track of its work and billed Connect, not the other way around.

- The hospital paid the doctor more than the annual compensation cap for two years. *Id.* at 603 ¶ 9. Here, Connect never paid Raba in excess of the compensation cap.

- The *Wood* contract included an audit provision requiring quarterly audits and reviews. *Id.* at 603 ¶ 7. Here, the audit provision applied "at all reasonable times during the course of such Work and for the above five 5 year period for the purpose of verifying costs incurred."

- The hospital sought to adjust for its overpayments after its contractual quarterly audit rights had lapsed. *Id.* at 604 ¶¶ 11–13. Here, Connect's audit rights had not lapsed when Connect acted.

- In the third contract year, the hospital withheld earned wages for overpayments it made to the doctor "in excess of a[n annual]

contractual compensation cap" during the previous two contract years. *Id.* at 602–04 ¶¶ 2, 11–12. Here, Connect withheld the payments during the same, five-year contract term.

**¶45** *Wood* affirmed summary judgment for the doctor was "consistent with [the] principles of equity." *Id.* at 607 ¶ 30. *Wood* reasoned the voluntary payment doctrine barred the hospital from recovering its overpayments because the doctor relied on the hospital's payments after the hospital allowed its audit rights to lapse and paid the doctor in excess of the annual compensation cap—not just once, but twice. *Id.* ¶ 28; *see also Moody*, 61 Ariz. at 540 (adopting the general rules on voluntary payments). The court said if the hospital had acted within the contract years, the doctor could have reduced his workload, negotiated a different deal, or quit. *Wood*, 249 Ariz. at 607 ¶ 30. Under those facts, *Wood* emphasized that the hospital "'had every opportunity to know' that payment was being made in excess of the cap and could have asserted the payment cap to avoid making such payments, had it exercised ordinary diligence." *Id.* at 604 ¶ 15.

**¶46** Because of the key differences between *Wood* and this case as outlined above, and consistent with the principles of equity, the court does not apply the voluntary payment doctrine here.

**¶47** As a final point on this issue, the Agreement's audit terms are not void under Arizona's prompt pay act for Department construction projects. *See* A.R.S. § 28-6924.A. The parties agree the Department's prompt pay act applies to the Agreement. And under that act, the parties may include audit terms so long as they do not "materially alter the rights of any contractor, subcontractor or material supplier to receive prompt and timely payment as provided under this section." A.R.S. § 28-6924.B. Raba has not argued the audit rights violated the Department's prompt pay act. And no case in Arizona has addressed either subsection B or Section 28-6924. The prompt pay act addresses void provisions, and limits them to the following:

> A provision, covenant, clause or understanding in, collateral to or affecting a construction contract that makes the contract subject to the laws of another state or that requires any litigation, arbitration or other dispute resolution proceeding arising from the contract to be conducted in another state is against this state's public policy and is void and unenforceable.

A.R.S. § 28-6926. The Agreement's audit terms do not violate that section.

### D. How readily Connect could have identified Raba's overbilling does not change the outcome.

¶48      Raba argues Connect cannot rely on its audit rights because it easily could have identified Raba's overbilling practices before it overpaid Raba. Connect reviewed and paid Raba's invoices monthly. Raba argues those invoices plainly showed it applied the labor multiplier to overtime. The superior court agreed, finding:

> The information contained in the invoice provided notice to [Connect] that Raba was billing the multiplier to all hours worked, including overtime hours. Nothing was hidden. The fact that Raba was applying the multiplier to all hours worked (49) could have easily been identified (and was) by [Connect] during its review of the invoice each month.

¶49      Even if factually true, by treating those facts as a legal defense, the superior court mooted Connect's audit rights. At its core, the argument asks the court to rule as a matter of law that if Raba's overbilling "could have easily been identified" on an invoice's face (itself a fact question as to what "could have easily been identified"), Connect has no recourse if it pays the erroneous amount, even if Connect must discover all such errors within the abbreviated timeframe imposed by the Department's prompt pay act. And even if Connect has reserved a contractual right to audit Raba's invoices later, Raba cites no case for that proposition. To the contrary, Arizona's interpretive canons directs the court to "attempt to reconcile and give effect to all terms of the contract to avoid any term being rendered superfluous." *Terrell v. Torres*, 248 Ariz. 47, 50 ¶ 14 (2020).

¶50      Whether an error requires a cursory or complicated audit, Raba agreed Connect would have the contractual right to audit for those errors. Nothing in the Agreement says Connect will be responsible for open and obvious billing errors. The court thus holds the Agreement's audit rights, when timely exercised, implicitly and necessarily empower Connect to correct payment errors during the Agreement's term.

### III.    Raba cannot establish equitable estoppel.

¶51      In its cross-appeal, Raba asks the court to reverse the superior court's grant of summary judgment in Connect's favor.

¶52      To establish equitable estoppel, Raba must prove: (1) Connect committed acts inconsistent with a position it later adopts; (2) Raba relied on it; and (3) Connect's repudiation of its earlier conduct injured Raba. *See*

*Valencia Energy Co. v. Ariz. Dep't of Revenue*, 191 Ariz. 565, 576–77 ¶ 35 (1998); *see also Lowe v. Pima Cnty.*, 217 Ariz. 642, 650 ¶ 34 (App. 2008) (recognizing "equitable estoppel is an affirmative defense").

**¶53** Raba argues Connect's earlier payment of the multiplier "expressed its unequivocal intent to waive" the Agreement's requirement for any amendments to be in writing and was contrary to the Agreement's express terms. And it argues it reasonably relied on those payments to its detriment. But Raba's performance was based on its contractual obligations under the Agreement, not Connect's erroneous overpayments.

**¶54** On the record provided, the superior court did not err in concluding Raba had no viable equitable estoppel claim. *See Best v. Edwards*, 217 Ariz. 497, 504 ¶ 27; *Valencia Energy Co.*, 191 Ariz. at 576–77 ¶ 35.

**¶55** As an aside, Raba says, "As a result of [Connect's] conduct, Raba had no need to bring a claim for rescission or reformation, which it certainly had the facts to support." But Raba never pressed a rescission or reformation claim and lost on its declaratory judgment claim.

## ATTORNEY FEES AND COSTS

**¶56** Connect and Raba request an award of attorney fees and costs on appeal under A.R.S. § 12-341.01 and the payment bond. Connect is the successful party on appeal. Accordingly, the court awards its reasonable attorney fees and taxable costs incurred on appeal under A.R.S. § 12-341.01 upon Connect's compliance with Rule 21, Arizona Rules of Civil Appellate Procedure. Because Raba is not the successful party on appeal, the court denies its request. The court does not address both parties' request for an award of fees and costs on appeal under the payment bond but remands the issue to the superior court.

**CONCLUSION**

¶**57**      The court affirms the superior court's ruling in Connect's favor on Raba's equitable estoppel claim. The court reverses the superior court's ruling on the voluntary payment doctrine. The court vacates the superior court's ruling on the payment bond, the award of attorney fees and costs, and the judgment. The court thus remands to the superior court to consider Connect's claims for attorney fees and costs and its claims under the payment bond.



**MATTHEW J. MARTIN • Clerk of the Court**
**FILED**:       JR